UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

PERFORMANCE DYNAMICS, INC.
an Indiana Corporation,
     PLAINTIFF,                    CASE NO.1:13-cv-00298-WTL-TAB

v.

TIMOTHY W. FLYNN; ANDREW BENNETT;
ROBERT WAINNER; LAURENCE BENZ;
COLORADO PHYSICAL THERAPY
SPECIALISTS, LLC, P.C., a Colorado
Limited Liability Company; TEXAS PHYSICAL
THERAPY SPECIALISTS, PC, a Texas
Professional Corporation; and
EVIDENCE IN MOTION, LLC, a Kentucky
Limited Liability Company,
     DEFENDANTS.

**PLAINTIFF'S MEMORANDUM BRIEF IN SUPPORT OF
MOTION TO ENFORCE SETTLEMENT AGREEMENT**

Performance Dynamics, Inc., Plaintiff, by counsel, pursuant to S. D. Ind. Local Rule

A.D.R. 2.6 (e) (3) of the United States District Court for the Southern District of Indiana,

respectfully submits its Memorandum Brief in Support of  its Motion to Enforce Settlement

Agreement.

**I.  Introduction And Background Of The Dispute**

Plaintiff Performance Dynamics, Inc. ("PDI") is the owner of the rights to a revolutionary

physical therapy methodology known as "ASTYM®" therapy, which utilizes topically applied,

hand-held instrumentation to treat soft tissue injuries and dysfunction. ASTYM® treatment is a

whole new approach to the treatment of soft tissue dysfunction.  This new type of approach was

developed by a group of academic and clinical researchers in a groundbreaking research

endeavor known as the Astym Research Project.   The research team consisted of well-known

1

and well-respected physicians, scientists, therapists, and healthcare professionals, including support from major universities and hospitals.  This eclectic combination of researchers had the unique advantage of being able to combine knowledge of physiology, cellular biology, emerging scientific discoveries, and a large experiential base of treating those with musculoskeletal and athletic injuries.  As a result, the Astym Research Project developed entirely unique new theories on how to engage soft tissue healing, and changed the actual paradigm on how to treat soft tissue dysfunction. One of the lead researchers of the Astym Research Project was Thomas L. Sevier, MD, an internal medicine and sports medicine physician, who is now the Medical Director of PDI.  PDI is the organization formed to own and administer the ASTYM® treatment program and became the owner of the intellectual property associated with it.

ASTYM® scientific and clinical research demonstrated that, following specific protocols and methods, instrumentation applied externally to the body could deliver pressures and shear forces in a manner to induce soft tissue healing and restoration.  The intellectual property of ASTYM® treatment is protected through a series of patents, trademarks, copyrights, and agreements with clinicians to whom PDI reveals its information in the course of their training in ASTYM® therapy.   Over 4500 clinicians across the country have been trained in ASTYM® and paid approximately $5,000 each to be certified by Plaintiff in this system.  The ASTYM® treatment methodology qualifies as a trade secret under the Indiana Trade Secrets Act ("ITSA"). Following its success, imitators tried to copy ASTYM® therapy, however those imitators could not replicate the safety or success of ASTYM® therapy without the extensive underlying scientific and clinical concepts developed through years of research and scientific study.  The imitators (instrument assisted soft tissue mobilizations or IASTMs) merely are trial and error

types that have repeatedly been shown to be ineffective in the medical literature, with significant questions regarding the safety.

Defendants hold advanced degrees, are clinically experienced physical therapists, and also are savvy businessmen who own and/or practice in their own clinics. They hold themselves out to be experts in the practice and business of healthcare. Together, they formed Evidence in Motion LLC ("EIM") as a for-profit vehicle to market and profit from continuing education in physical therapy and business techniques to a universe of followers estimated to be approximately 30,000 physical therapists. (See Dkt. 107, Jurisdictional Statement of Defendants). EIM has grown to become perhaps the largest provider in the United States of post-degree continuing education for physical therapists. In 2005, two principals of EIM approached Dr. Sevier, inquiring about the confidential details of ASTYM® treatment, and expressing an interest in perhaps having ASTYM® treatment taught in the curriculum of EIM. When they first sought to obtain information on ASTYM®, these EIM principals – Robert Wainner and John Childs – signed a Confidentiality Agreement with PDI on behalf of themselves and EIM. Immediately thereafter, Wainner and a colleague, Andrew Bennett, enrolled to be personally trained in ASTYM® treatment, which required them and their clinic (Defendant Texas Physical Therapy Specialists P.C.) to sign various contracts by which they agreed that PDI's information was a trade secret that they would not reveal beyond its use in their practice, and that they would not teach or otherwise instruct others in ASTYM® therapy or any imitation or "knock-off" methodology. (These Agreements are exhibits to Plaintiff's Second Amended Complaint, Dkts. 69-3, 69-5).

Immediately after receiving the training, Wainner publicly praised ASTYM® as a "novel treatment concept" on EIM's website, and sent other therapists from his clinic to be trained and

3

certified.  The following year (2007), Timothy Flynn, another EIM principal, also sought ASTYM® training for himself and others at his clinic, Defendant Colorado Physical Therapy Specialists LLC, P.C.  In the years that followed, Flynn also submitted glowing reviews of ASTYM® therapy results for publication on various websites. When Defendants were inquiring about the details of, and becoming trained in, ASTYM® treatment, they continued to represent they were interested in having ASTYM® therapy taught in the EIM curriculum, and how impressed they were with the ASTYM®  training and treatment itself.  Following training, the Defendants talked about how ASTYM® treatment is a much needed new concept in therapy, and how everyone was talking about it.  The Defendants referred to ASTYM® therapy as "novel" and "revolutionary."  Discussions continued where the Defendants expressed interest in having ASTYM® therapy as part of the EIM curriculum; however, in stark contrast to what the Defendants were representing to the Plaintiff, the Defendants began teaching ASTYM® material under another name as early as 2010.

Discovery showed that none of these Defendants could identify any specific training or education in imitations of ASTYM® therapy (instrument assisted soft tissue mobilization) before or after ASTYM® therapy training. All of their formal training and exposure to the scientific research and theory supporting ASTYM® was acquired in their training received from Plaintiff.

Despite their promises in their agreements and the general legal prohibitions of the Indiana Trade Secrets Act ("ITSA"), Plaintiff learned through discovery that as early as 2010, EIM, Flynn and Bennett began offering instruction to EIM's constituency in a subject it called "ISTM" (which they pronounced as I-stim as opposed to A-stim – which is how ASTYM® is pronounced), or "Instrumented Soft Tissue Mobilization."  At least five such seminars were disclosed in written discovery, and Plaintiff has reason to believe a number of others also were

done.   (No Defendant was produced for deposition).  Plaintiff first had actual knowledge the Defendants were engaging in this conduct when it learned they intended to offer the instruction at a Virginia seminar in November, 2012.  Plaintiff's General Counsel wrote to warn them that to do so would violate PDI's intellectual property rights, but Flynn and Bennett, the instructors of the seminar, in consultation with Wainner and Laurence Benz (also EIM principals), disregarded the warning and proceeded with the seminar.  PDI enrolled two ASTYM® instructors to attend the presentations.   One of them, Suzie Freeman, was deposed and testified the content in the seminar on "ISTM" was 90% ASTYM® material.  Moreover, as the required reading for the seminar, Defendants instructed attendees to study two journal articles on ASTYM® therapy, and even though one included ASTYM® and its trademark in the title, both were retitled by the Defendants as "ISTM" articles.  After initial efforts to resolve this dispute proved unsuccessful, this litigation followed in which PDI sought, among other things, to restrain the Defendants from further breaches of their contractual promises and/or further misappropriations of PDI's trade secrets in violation of ITSA.

Plaintiff filed in state court, but Defendants removed to this Court in February, 2013. A period of inactivity followed during which the parties attempted to resolve the dispute. This ended with an unsuccessful Settlement Conference with Magistrate Judge Baker on December 2, 2013. After that, both sides engaged in substantial written discovery and, as noted, Ms. Freeman was deposed by Defendants. Meanwhile, PDI continued to serve written discovery and attempt to schedule the depositions of the Defendants and some of their employees, and issues were arising over the sufficiency of responses to Plaintiff's discovery. These matters were being discussed by the parties in an effort to avoid discovery disputes. In the midst of these discussions, late in 2014, PDI filed a Second Amended Complaint based upon discovery it had

received. Defendants filed an Answer and Counterclaim and Motion for Partial Dismissal. Plaintiff responded with a Motion for Partial Summary Judgment as to the Counterclaim. With these substantive motions pending, insufficient discovery responses of the Defendants creating the potential for motions to compel and discovery litigation, and the parties on the edge of engaging in multiple depositions of the Defendants, other principals of EIM, Defendants' employees (all residents of other states), as well as Plaintiff's representatives, a dialogue began again between counsel to seek a resolution to the case.

PDI had always insisted that any settlement would require entry of an agreed injunction pursuant to which the Defendants would agree to not teach ASTYM® therapy or any imitation treatment (instrument assisted soft tissue mobilization), because this was what they had promised in their written agreements in order to have access to the intellectual property of PDI, and also because teaching such courses would violate PDI's rights under ITSA. When counsel for the Defendants in March, 2015 indicated that he believed he had his clients at a point where they would agree to such a consent decree, the parties rapidly began to exchange their views on the details of such a settlement and asked Judge Baker for another Settlement Conference, which was held on April 20, 2015.

## II. The Negotiation and Formation Of The Settlement Agreement

The April 20, 2015 Settlement Conference resulted in the parties executing a 7 page document. Because the dispute before the Court focuses only on one sentence, PDI only attached the one page containing that sentence to its Motion to Enforce the Agreement.  However, to put the settlement in context and better illuminate the history of the current dispute, attached to this

Memorandum as Exhibit 1 is the complete agreement executed in Judge Baker's chambers on April 20.

The document is signed by Plaintiff's counsel Scott Shockley and Amy White, General Counsel for PDI. For the Defendants, it is signed by their lead attorney Benjamin Fultz, and Laurence Benz, the Founding Member and Manager of EIM and an individually named Defendant. The other Defendants and their representatives – Timothy Flynn (individually and on behalf of Colorado Physical Therapy Specialists), Andrew Bennett, and Robert Wainner (individually and on behalf of Texas Physical Therapy Specialists) - - were present but substantially delegated the negotiations to Mr. Fultz and Dr. Benz. In their Response (Dkt. 105) to Plaintiff's Motion, these other Defendants do not raise any issue as to the authority of Mr. Fultz and Dr. Benz to enter into this agreement.

Mr. Fultz, it should be noted, is the senior named partner in the Louisville, Kentucky law firm Fultz, Maddox Dickens PLC. The firm's website lists Mr. Fultz's practice areas as Health Care, Litigation, and Business, and indicates he is a member of the American Health Lawyers Association.[1] Dr. Benz holds a Doctorate in Physical Therapy and an M.B.A. and is the President/CEO of Confluent Health, an organization that includes Defendants EIM, Texas Physical Therapy Specialists, and six other health care providers. The EIM website indicates Dr. Benz is a frequent speaker at physical therapy and MBA programs throughout the country, and has been on the Advisory Panel on Practice of the American Physical Therapy Association ("APTA").[2] Thus, it is clear that in negotiating this agreement, the Defendants were well represented by counsel and a representative Defendant with extensive experience in health care

---

[1] www.fmhd.com/fmhd_fultz.htm (last visited Nov. 13, 2015).
[2] www.evidenceinmotion.com/who-we-are/executive-team/ (last visited Nov. 13, 2015)

and the legal or business issues associated with it.  The Settlement Agreement was thus not the work product of counsel unfamiliar with the subject matter or a Defendant that did not understand the meaning of the document he was signing.

As the Court can see from the Agreement, Exhibit 1, it bears numerous handwritten deletions, additions, and other indicia of a vigorously negotiated contract.  The "Settlement Agreement" is actually two documents:  the first three (3) pages constitute the private settlement agreement between the parties, and the last four (4) pages represent the proposed Agreed Entry the parties intended to submit to the Court to enjoin the Defendants from further teaching, instructing or advising anyone in ASTYM® therapy or any "knock off" methodology (instrumented soft tissue treatment or intervention).  This dispute focuses on one sentence in page one (1) of the private settlement agreement between the parties.

That sentence appears in renumbered paragraph 3 and provides simply that "No other instrumented soft tissue treatment shall be provided at any such facility."[3]  As is obvious, the documents utilized to craft the settlement are typewritten and were prepared and circulated between the parties before the Settlement Conference. The handwritten revisions and marginal entries were added at the April 20 Conference.

On April 16, 2015 - - four days before the Conference - - Plaintiff's counsel Scott Shockley sent to Mr. Fultz and other defense counsel the draft of the proposed Agreed Entry— the last four (4) pages of what later became the executed Settlement Agreement.  On the morning of the next day, April 17, 2015, Mr. Shockley sent to defense counsel a second document consisting of three (3) pages with nine (9) numbered paragraphs that constituted Plaintiff's

---

[3] The disputed sentence is highlighted for the convenience of the Court on the PDF exhibit 1.

demand for the private settlement agreement and which became the first three (3) pages of the April 20 Agreement.  One of those paragraphs--#6 on Plaintiff's April 17 draft—proposed that the settlement include the sentence or provision now in dispute—that "No other instrumented soft tissue treatment shall be provided at any such facility." Those nine paragraphs contained Plaintiff's proposed terms for the Settlement Agreement, apart from the terms of the proposed Agreed Entry.  The April 16 and 17 transmittals were the templates that the parties then used to mark up on April 20, resulting in Exhibit 1, the Settlement Agreement.  This demonstrates that for several days before and going into the Settlement Conference, Defendants and their counsel had the draft of the disputed sentence to consider its implications.  It was not a term added in haste in the Court's chambers on April 20.

Draft Paragraph 6, renumbered as 3 in the executed Agreement, was important to Plaintiff for several reasons.  Apart from the issue of the Defendants breaching their agreements and teaching their own knock off version of instrumented soft tissue mobilization using Plaintiff's information, PDI learned in discovery that Defendants, in violation of their agreements and ITSA, were instructing their own employees in ASTYM® therapy methods, and those clinicians were then improperly offering either ASTYM® therapy or a generic knockoff of ASTYM® therapy in their practices,  without being certified by PDI and without the Defendant clinic paying any fees for training or certification. For example, Texas P.T. produced an e-mail from Andrew Bennett dated July 18, 2011 to an executive of another clinic discussing ASTYM® and other methodologies in which Dr. Bennett stated:

> I did ASTYM training with Rob and found the actual training very
> well done and worth the time/$.  The cost model for the tools is
> garbage.  Annual "rental" fee for the tools that you never really
> own.  Like Graston, ASTYM has many hi (sic) quality marketing

materials and website "find an ASTYM provider" publicity. However, I'm not convinced it's worth the painful annual fee.

There are many tools available online. Check out http:www.starrtool.com/ http:www.fibroblaster.com/ and http://guashatools.com.

All much cheaper, very good, but without training. *What we're doing locally?* **Got a few clinicians certified by ASTYM** and Graston, and we get a local champion **who can teach it** and then buy the cheaper tools.

Plaintiff's Ex. 2, Doc. Bennett/TX PT Doc. 0008 (emphasis added). When asked by an interrogatory to identify who at Texas PT he had trained in ASTYM® therapy or an imitation (instrumented soft tissue mobilization), Bennett refused to answer, interposing generic and non-responsive objections. See, Plaintiff's Exhibit 3, Second Set of Interrogatories to Andrew Bennett, Interrogatory No. 14.

In another email exchange, Jeanne Smith, a Texas PT physical therapist, told Bennett she was going to delay returning the ASTYM® tools to Plaintiff (after Plaintiff had made a demand that Texas return excess instruments) because "most all the patients (all 12 on my schedule next week) are getting ASTYM . . .  I will stall for a couple of days on returning the ASTYM tools." Plaintiff's Ex. 4, Bennett/TX PT Doc. 0052; e-mail of May 18, 2012.

Jeanne Smith was never trained or certified in ASTYM® therapy, yet by her admission in the e-mail, with Bennett's knowledge, she was practicing ASTYM® therapy on her patients. Apparently she was one of the therapists taught ASTYM® therapy by a "local champion" as described by Bennett in his July 18, 2011 e-mail.  So it was important to Plaintiff to not merely stop the Defendants from teaching the subject to the public in violation of their contracts and Plaintiff's legal rights, but also to stop the Defendants from teaching the subject to their own

clinicians, which also violated their contractual promises and misappropriated Plaintiff's confidential information.

Plaintiff's response to the problem and approach at settlement was to propose two provisions in the original Paragraph 6. The first was a requirement that all clinicians in Defendants' clinics be trained in ASTYM® therapy and maintain certification. The second was that other than ASTYM® therapy, no imitation, or other instrumented soft tissue treatment shall be provided at Defendants' facilities.

The negotiations on April 20 lasted approximately six hours. Numerous subjects were discussed, as the extensive mark ups would suggest. During the negotiations, it was agreed that PDI's first proposal - - that all clinicians had to be trained in ASTYM and maintain certification - - would be modified so that it was not required, but only "recommended and encouraged", and that language was added as a marginal, handwritten entry that appears on page 1 of Ex. 1. That was a concession PDI made. To insist on training and certification of every clinician would have been expensive for the Defendants. The other provision - - that no instrumented soft tissue treatment other than ASTYM® therapy shall be provided at Defendants' clinics - - remained as it always had been since the parties first circulated the draft language three days earlier. This solved the problem of uncertified clinicians improperly delivering an imitation of ASTYM® therapy, because if instrumented soft tissue mobilization was going to be offered, it had to be genuine ASTYM® therapy, not a knockoff learned third hand. Any clinician improperly using ASTYM® therapy or a knockoff would have to be properly trained and certified by PDI. In PDI's view, this was a classic quid pro quo- - PDI conceded it would not insist that all clinicians be trained in ASTYM® therapy, and the Defendants conceded that if any clinician practiced instrumented soft

tissue mobilization in their facilities, it would be ASTYM® therapy.   The parties and their representatives signed the document and PDI thought the dispute was over.

In their Response Defendants indicated that "Counsel for the Defendants orally advised all other persons at the mediation . . . that the Defendants could not agree to any provision in the settlement agreement that would limit the use of treatments that individual physical therapists in their professional judgment deemed necessary for their patients." (Dkt. 105, Para. 3). Plaintiff's recollection is a little different - - Plaintiff's counsel and its representative remember general discussion about whether the Defendants could or would control their employees' choices of treatment methodologies, but it was in the larger context of the paragraph as a whole. Could or would Defendants *require* their clinicians to receive training in ASTYM® therapy? Could or would Defendants prohibit their employees from practicing imitations of ASTYM® therapy, but rather be certified in ASTYM® therapy?

Although Plaintiff's counsel may have suggested that he didn't believe a clinic should be telling its therapist-employee what they could or couldn't do, it was never suggested at the April 20 conference that the disputed paragraph was contrary to law or would violate the law, as Defendants now maintain (*Id.* Para. 4). Moreover, the specific claim that to do so would violate the law or a legal doctrine (the Corporate Practice of Medicine, or "CPOM") was not made during the mediation. If it had been, it would have been an obvious insurmountable obstacle—no one would proceed to craft a settlement and sign a settlement document if one of the parties is simultaneously suggesting a provision is *ultra vires*, and no one who thinks such a provision will result in the law being violated signs such an agreement. Plaintiff's understanding of the agreement as to that paragraph was simply that each party conceded something to achieve a compromise solution:  all clinicians would not be required to be ASTYM®-trained and certified

(a compulsory provision covering all clinicians would be expensive), but if their clinicians practiced an imitation of ASTYM® therapy (instrument assisted soft tissue mobilization), they would be required to become properly trained and certified in genuine ASTYM® therapy (thus addressing PDI's concerns over Defendants improperly teaching their own clinicians confidential ASTYM® methods in violation of their agreements and ITSA).   Plaintiff's representatives believed then, and continue to firmly believe, the sentence now in dispute is something that is a common practice and well accepted.   Hospitals and other health care providers approve or disapprove of certain practices being permitted in their facilities on a daily basis. This seemed like a fair solution at the time, and the way disputes like this are typically settled with each party giving and/or taking a little.

After the Settlement Conference adjourned, Judge Baker believed there was a settlement and made an entry to that effect. (Dkt. 95).   The Settlement Agreement (Ex. 1) as executed on April 20 is obviously rough and required editing to create a proper document. Defense counsel volunteered to undertake that task.   On June 4, 2015 Mr. Fultz sent to Mr. Shockley his draft of the proposed cleaned-up version of the April 20 Settlement Agreement.   That version, however, completely omitted the sentence at issue here, without any indication that such a modification had been made.   Mr. Shockley then responded with a red-lined version inserting the sentence from the April 20 Agreement with an explanation that it was what was agreed upon and contained in the original rough settlement document, and upon close review, it was discovered to be missing.

At some point around June 22 or 23, Mr. Fultz called Mr. Shockley and explained that he believed that the sentence in the agreement could violate the corporate practice of medicine doctrine ("CPOM").   On June 29 and July 2 the parties exchanged long e-mails, each discussing their respective opinions regarding whether the provision violated the CPOM.   As a result of that

exchange, Plaintiff offered to consult with a law firm with expertise in health care law to review Mr. Fultz's concerns, and so advised him on July 6.  Plaintiff engaged R. Terry Heath of Hall Render in Indianapolis to review the issue, and on August 4 Hall Render provided a memorandum expressing the opinion that the provision did not violate the CPOM, focusing its opinion on the 4 states in which the Defendants do business.  That was forwarded to Mr. Fultz, and thereafter Mr. Fultz and Mr. Heath discussed it.  Mr. Fultz then e-mailed Mr. Shockley on August 14 with new objections, indicating that an opinion limited to the 4 states in which the Defendants did business was insufficient because his clients may someday wish to do business in all 50 states. Mr. Fultz then added another new, additional objection: that the provision may violate APTA ethical standards (both of which were new concerns raised for the first time in this email); and he also requested that Hall Render issue a formal opinion letter to the Defendants.  On August 20 Mr. Shockley responded, indicating Hall Render had not been engaged to issue an opinion letter for the Defendants and that Plaintiff considered the matter closed, was ready to file to enforce the settlement agreement, and attached a draft of the motion to enforce.

Sometime after August 20, Mr. Fultz called Mr. Shockley and again raised another new argument for the first time - - that the term "instrumented soft tissue treatment" in the document could be interpreted to apply, for example, to the use of things like foam rolls, rubber tubing, exercise balls, etc. by therapists in their work. Therefore, Mr. Fultz explained, any such procedure could arguably violate the agreement. This was a new issue, raised for the first time four months after the Settlement Agreement had been executed. Mr. Shockley responded on August 27 with an e-mail indicating that the phrase in question - - "instrumented soft tissue mobilization"-- was well understood and had a particularized meaning within the context of the lawsuit.  A copy of that e-mail is attached as Exhibit 5. Mr. Fultz responded the same day with proposed alternative

14

language, which is what the Defendants have quoted verbatim at paragraph 6 of their Response (Dkt. 105).  This language, however, seeks to redefine the simple phrase agreed upon on April 20 to limit its exclusion to "proprietary or commercial soft tissue treatment."  In other words, the "knock off" methodologies taught to Defendants' employees as "ISTM" would not be prohibited, because that methodology is neither commercial nor proprietary.  But that is exactly what Plaintiff sought to preclude by insisting upon the sentence in the Settlement Agreement that is now in dispute.

Mr. Shockley responded on September 8, 2015 indicating that Plaintiff had considered Defendants' CPOM contention, and believed it lacked merit.  The e-mail went on to discuss that the belated issue about interpretation of the sentence, or its reference to instruments, was an attempt to redefine a term or phrase in the settlement agreement; that the term had been at the heart of the litigation since its inception; that it was well understood to apply to the methodologies at issue, and not to counsel's hypotheticals about foam rolls, tubing, exercise balls, etc.  It was in this e-mail where Mr. Shockley observed that Plaintiff had no intention of trying to enforce their settlement to preclude such unrelated activities (including an observation that in fact if Plaintiff did attempt to do so, it would lose, owe the Defendants attorney's fees for a frivolous claim, and so forth)—a statement taken out of context and used in a misleading fashion as quoted by Defendants in their Response, Dkt. 107 at paragraph 7. Further exchanges followed attempting to resolve the differences between the parties, without success.  To provide complete and fair context, a copy of the chain of e-mail communications between Mr. Fultz and Mr. Shockley from September 8 to September 9 is attached as Exhibit 6.

### III.  Standard of Review

The District Court, as supervisor of the litigation before it, has the inherent power to enforce or implement a settlement agreement between the parties.  *Carr v. Runyan*, 89 F. 3d 327, 331 (7th Cir. 1996).  The Court's decision is reviewed for an abuse of discretion.  *Dillard v. Savcom Int'l., Inc.*, 483 F. 3d 502, 506 (7th Cir. 2007); *Hakim v. Payco-Gen. Am. Credits, Inc.*, 272 F. 3d 932, 935 (7th Cir. 2001).  Interpretation of a written mediation settlement agreement is governed by the substantive contract law of the state in which the District Court sits.  *Dillard*, 483 F.3d at 507; *Lynch, Inc. v. Samata Mason, Inc.*, 279 F. 3d 487, 490 (7th Cir. 2001) citing *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 380-382 (1994).  Thus, Indiana law governs issues concerning the formation, construction, and enforceability of the agreement at issue here. *Carr*, 89 F. 3d at 331.

### IV.  The Settlement Agreement Is An Enforceable Contract

The April 20, 2015 Settlement Agreement was the product of six hours of negotiations supervised by Judge Baker.  It was signed by Defendants' counsel and their lead representative, Dr. Benz.  The sentence in issue - - "No other instrumented soft tissue treatment shall be provided at such facility" - - was not some handwritten, eleventh hour provision.  It had been in the provisions of the draft documents in exactly the same form since those proposed documents were first circulated several days before the Conference.  Defendants obviously had ample time to analyze it and think through any objections to it, or any potential conflict they believed existed between it and any legal authority.  As the following argument illustrates, Defendants' current objection to finalizing the settlement misapprehends Indiana contract law and the corporate practice of medicine doctrine.

### A. <u>Contract Formation</u>

A district court analyzing enforcement of a settlement agreement applies ordinary elements of contract formation. *Allen v. Dana Corp.*, 2011 U.S. Dist LEXIS 1430, * 3, * 5-6 (N.D. Ind., July 26, 2011) (Simon, C.J.). Agreements to settle are enforceable against a party who knowingly and voluntarily agreed to the terms of the settlement. *Sablic v. Gutierrez*, 2012 U.S. Dist. LEXIS 158123, *5-6 (N.D. Ind., Nov. 5, 2012). A party to a settlement agreement may not avoid the agreement he made merely because later he believes it insufficient or has "buyer's remorse." *Glass v. Rock Island Refining Corp.*, 788 F. 2d 450, 454-455 (7th Cir. 1986).

Under Indiana law, contract formation requires mutual assent on all essential contract terms. Assent to the terms of a contract may be expressed by acts which manifest acceptance, such as signing the agreement. *Buschman v. ADS Corporation*, 782 N.E. 2d 423, 428 (Ind. Ct. App. 2003). A person is presumed to understand and assent to the terms of a contract he signs. *Id*.; *John M. Abbott, LLC v. Lake City Bank*, 14 N.E. 3d 53, 58 (Ind. Ct. App. 2014); *Jackson v. Bank of America Corp.*, 711 F. 3d 788, 793 (7th Cir. 2013) (applying Indiana law); *Sanford v. Castleton Health Care Center, LLC*, 813 N.E. 2d 411, 418 (Ind. Ct. App. 2004).

Compromise of a disputed claim constitutes adequate consideration. *Moon v. Martin*, 23 N.E. 668, 669 (Ind. 1890). Indiana has a strong presumption favoring freedom of contract and enforceability of contracts that are the freely bargained agreement of the parties. *Wellpoint, Inc. v. Nat'l. Union Fire Ins. Co. of Pittsburgh*, 29 N.E. 3d 716, 724 (Ind. 2015); *BMD Contractors, Inc. v. Fidelity and Deposit Company of Maryland*, 679 F. 3d 643, 652 (7th Cir. 2012) (applying Indiana law); *Zollman v. Geneva Leasing Associates*, 780 N.E. 2d 387, 391 (Ind. Ct. App. 2002). Although Defendants allege that enforcing the Settlement Agreement would violate public policy (Response, Dkt. 105 (Para.5), in fact just the opposite is true. Indiana courts hold that enforcing

the terms of a freely bargained contract advances public policy. *Id.*; *BMD Contractors*, 679 F. 3d at 652.

Public policy challenges to the enforceability of contracts typically fall into one of three categories:  (a) a contention that the contract violates a declared public policy of the state; or, (b) an argument that the contract violates a statute; or, (c) a suggestion that the agreement clearly tends to injure the public in some way.  *Wellpoint*, 29 N.E. 3d at 724; *Continental Basketball Assoc. v. Ellerstein*, 669 N.E. 2d 134, 139-141 (Ind. 1996).  In this case, Defendants have only alleged generally that the provision at issue violates public policy. The Response fails to articulate any declared public policy of Indiana that the provision could possibly violate. Similarly, Defendants do not suggest that the general public would be harmed by the provision. That leaves the question of whether or not the sentence violates the law or requires the Defendants to violate the law.

Defendants generally allege the provision violates the "corporate practice of medicine" doctrine.  (Dkt. 105, Para. 4).  As noted *infra*, this "doctrine" is a perspective on the nature or extent of control that corporate providers may exercise over the independent acts of practitioners. See Part C, *infra*.

This "doctrine," however, lacks the clarity and specificity required to meet the legal test for setting aside a contract.  The test for declaring a contractual provision unenforceable because of alleged conflict with a statute is demanding: "Indiana courts . . . will not find a violation unless the language of the implicated statute is clear and unambiguous that the legislature intended that the courts not be available for either party to enforce a bargain made in violation thereof."  *BMD Contractors, Inc.* 679 F. 3d at 652 quoting *Indiana Dept. of Transp. v. Shelley  & Sands*, 756 N.E. 2d 1063, 1073 (Ind. Ct. App. 2001).  See also *Wright v. City of Gary*, 963 N.E.

2d 637, 649 (Ind. Ct. App. 2012); *Ellerstein*, 669 N.E. 2d at 140.  Defendants have wholly failed to identify any statute or statutory scheme that meets this test.  The corporate practice of medicine doctrine is not embodied in any Indiana statute pertaining to physical therapists, nor is it applicable in the three other states where Defendants practice.  (See Part C, *infra*).  Setting aside a provision in a freely negotiated settlement between sophisticated litigants requires a clear showing of a statute that prohibits exactly what the parties have attempted to do.  Defendants have not cited any such evidence or statute, nor does any such statute exist that is violated by the provision at issue here.

### B.  The Provision is not Ambiguous

Four months after the Settlement Agreement had been inked in April, Defendants raised a new issue:  that the provision could be interpreted to apply to a wide variety of techniques employed by therapists in their clinics, thus putting the Defendants at risk of violating the Settlement Agreement.  Under Indiana law, a contract is ambiguous "only if reasonable persons could differ as to the meaning of its terms".  *IP of A West 86th Street 1, LLC v. Morgan Stanley Mortgage Captial Holdings, LLC*, 686 F. 3d 361, 368 (7th Cir. 2012) (applying Indiana law).  Language in a contract is not ambiguous simply because the parties disagree as to the potential meaning of a term.  *Automation by Design v. Raybestos Products Co.*, 463 F. 3d 749, 754 (7th Cir. 2006) (construing Indiana law).  Moreover, Indiana law provides that:

> In determining the intention of the parties to a contract, Indiana courts – in addition to ascertaining the plain meaning of the contract terms – have a duty to consider . . . the surrounding circumstances which existed at the time the contract was made, including "the nature of the agreement, together with all the facts and circumstances leading up to the execution of the contract, the relation of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract."

*Rain v. Rolls Royce Corp.*, 626 F. 3d 372, 381 (7th Cir. 2010) quoting *Ruff v. Charter*

*Behavioral Health System of Northwest Indiana, Inc.*, 699 N.E. 2d 1171, 1176 (Ind. Ct. App. 1998).

The attempt by Defendants to interject this ambiguity argument four months after the settlement, and after Plaintiff had addressed Defendants' contentions about the CPOM issue, cannot withstand the scrutiny of examining it against the backdrop of the context of this case, the history of the Defendants, and all of the surrounding circumstances. The phrase "instrumented soft tissue treatment [or mobilization]" has been the central issue in this case from the commencement of the lawsuit, and even before that. Defendants always have known what this term means. They held themselves out to the world as experts and instructors in "Instrumented Soft Tissue Mobilization" at the EIM seminar that preceded this lawsuit. (Dkts. 69-6, 7). In their counterclaim, they claimed that at their clinics their clinicians practiced the technique and they defined it: "IASTM generally involves the topical application of tools over the body to break down adhesions and scar tissue following injuries or surgery, and to treat soft tissue dysfunction." (Dkt 72, Counterclaim, Para. 6) The history of the Defendants receiving training and/or exposure to instrumented soft tissue treatment from and by Plaintiff goes back 10 years before execution of this Settlement Agreement to 2005 when PDI's Medical Director Dr. Thomas Sevier first met with Defendant Wainner and another EIM principal. Shortly thereafter, Defendants Wainner, Flynn and Bennett all received training from Plaintiff. (Dkt. 80-1, Affidavit of Sevier). In the years that followed, they publicized their praises of Plaintiff's instrumented soft tissue treatment. (Dkts. 79-4, 5, 6). They have sent summaries of the content for their instrumented soft tissue mobilization courses to various state agencies to obtain continuing education credit, each specifying the details of how, when, and where to apply ISTM in one's practice. (Dkt. 82-6). When confronted by Plaintiff's General Counsel about

potentially breaching the restrictions in their Service Agreements if they taught their ISTM seminar in Virginia in November, 2012,  Defendants engaged in a series of e-mails discussing other specific tools they could use or teach about, and other imitative techniques, to attempt to circumvent their responsibilities. (Dkt. 82-2). At that time, they showed themselves to be well versed in what options existed for instrumented soft tissue mobilization. In Dr. Bennett's e-mail to a colleague about how in his clinic they get someone trained in ASTYM® and then teach it to others, he identifies the various on-line sources for the types of rigid tools or instruments used in this therapy: "There are many tools available online. Check out http://www.starrtool.com........" (Ex. 2). The Bennett e-mail is an illustration that these Defendants are not confused about the types of "instruments" that are employed in the instrumented soft tissue treatment they agreed to restrict.

As the foregoing history demonstrates, the parties understood what "instrumented soft tissue treatment" means perfectly well.  That's why when defense counsel indicated in March that he had his clients at a place where they would agree to an injunction against teaching the subject, it wasn't necessary to ask to define more precisely what the term meant, or what were the contours of that restriction.  Similarly, that's why when Plaintiff's counsel sent drafts of proposed settlement documents to Defendants three or four days before the April 20 Settlement Conference, and both documents contained the term "Instrumented Soft Tissue Treatment," the question never arose what that term meant, nor did it need to be defined.

Defendants have now suggested hypothetical interpretations in an effort to create an ambiguity.  But such extrinsic evidence is not admissible to create an ambiguity where none exists.  See, e.g., *Holmes v. Potter*, 552 F. 3d 536, 540 (7th Cir. 2008) (construing Indiana law).  Defense counsel subsequently proposed language to "fix" a problem that didn't exist, or which

was an issue manufactured to attempt to scuttle or modify the settlement after the CPOM contention was shown to lack merit. The problem with this proposed language, however, was that it redefined the contractual term in issue to something much more narrow – "other proprietary or commercial soft tissue treatments " - - a change that would allow the clinicians in Defendants' clinics to continue to practice a knock off form of instrumented soft  tissue treatment based in part upon prohibited training in ASTYM® therapy by the Defendants.

The contractual provision at issue is not ambiguous and was freely agreed upon by Defendants. Any restriction or limitation it may impose upon the practice of instrumented soft tissue treatment by non-ASTYM® trained therapists in Defendants' clinics is exactly the result intended by Plaintiff in negotiating this Agreement due to the abuse by the Defendants of the restrictions in their contracts with Plaintiff against teaching ASTYM® therapy or other methodologies to other parties.

### C.  The Provision Does not Violate the Corporate Practice of Medicine Doctrine

 Defendants' assertion that the Corporate Practice of Medicine doctrine (CPOM) prevents enforcement of the Settlement agreed to by the parties is incorrect. CPOM generally guides determinations of entity ownership, physician employment, and facility liability in medical malpractice cases. For the four states in which the Defendants do business, CPOM does not prohibit the Settlement. Kentucky does not recognize the prohibition on CPOM, Indiana and Texas limit their CPOM prohibitions to physicians, and Colorado expressly permits the language included in the Settlement. Finally, even if the CPOM could arguably be applied to the Defendants, limitations on medical devices and imposition of process protocols are common among hospitals and professional practices and would not constitute violations of the CPOM in the relevant states.

The doctrine of Corporate Practice of Medicine generally limits the formation of entities for employing health care providers. It has two main functions. First, it attempts to separate medical decision-making from business considerations by ensuring that professional judgment is the driving force behind medical treatments. Second, it limits medical malpractice liability for health care entities by resting liability for negligence at the feet of the medical decision maker: the physician. Entities practicing medicine in a state that has a CPOM prohibition face liability for the unauthorized practice of medicine. The doctrine has been eroded as modern medical practices have become integrated systems.

### 1. Kentucky does not have a CPOM prohibition.

Kentucky has no statute prohibiting the corporate practice of medicine—though it has licensing restrictions for individual health care providers in the state. The Settlement Agreement would therefore be enforceable under Kentucky law. *See generally* KY. REV. STAT. ANN. § 311.565 (2015) (setting forth licensing requirements for health care providers).

### 2. Indiana and Texas's CPOM prohibitions do not apply to physical therapists.

Both Indiana and Texas have laws prohibiting entity interference or control over a physician's decisions. However, these laws do not apply to the Indiana and Texas Defendants, which are physical therapy providers.  In order to best understand the situation in Indiana, one must follow the Indiana statutes discussed below.

1. IND. CODE § 25-22.5-1-1.1 arguably includes the practice of physical therapy within the definition of the "practice of medicine" for purposes of I.C. § 25-22.5.

2. I.C. § 25-22.5-8-1 specifies that it is "unlawful for any person to practice medicine . . . without holding a license or permit to do so." Therefore, on its face this Indiana CPOM statute would preclude Defendant, an entity, from practicing physical therapy

in Indiana.

3. However, I.C. § 25-22.5-1-2(a) eliminates the I.C. § 25-22.5-8-1 prohibition for 26 types of individuals or entities in Indiana. Assuming Defendant properly exists as one of these permitted types of entities, I.C. § 25-22.5-8-1's prohibition does not apply to Defendant.

Interestingly, I.C. § 25-22.5-1-2(c) sets forth a seemingly needless additional rule that states that the employment of "licensed physicians" by two types of permitted entities will not constitute the unlawful practice of medicine so long as the entity does not direct or control independent medical acts, decisions, or the judgment of the licensed physicians (the "Control Prohibition").

Therefore, by implication, I.C. § 25-22.5-1-2(c) mandates that if licensed physicians are employed by one of the two entity named subsets of I.C. § 25-22.5-1-2(a) entities, their employer may not impinge upon employed physicians' medical judgment or decision making. In the case at hand, the professionals are physical therapists, not licensed physicians and therefore the Control Prohibition plainly does not apply to the Indiana Defendant.

A review of Indiana case law relevant to this issue did not return any cases on point or any cases applying or reviewing I.C. § 25-22.5-1-2(c) prohibiting control of physician judgment. Rather, Indiana cases dealing with the CPOM deal with the liability of employers for the actions of their employed health care professionals.

Given the above, properly qualified employers of physical therapists in Indiana are not subject to the Control Prohibition that applies only to licensed physicians. Therefore, the Settlement Agreement is not contrary to Indiana law regarding CPOM.

Texas too has a CPOM prohibition that permits licensed entities to practice medicine so

long as they do not "interfere with, control, or otherwise direct a physician's professional judgment." TEXAS OCCUPATIONS CODE § 162.0021 (2015). Texas law specifically applies only to physicians, which under Texas statute are people "licensed to practice medicine" in Texas. Texas Occ. Code § 151.002. Finally, physical therapists are precluded by Texas law from "practicing medicine" within Texas. TEXAS OCC. CODE § 453.006 (2015).

A review of Texas case law relevant to this issue did not return any cases on point or any cases applying or reviewing Section 162.0021's prohibition of control over a physician's judgment. Because Texas's statutory prohibition against entities controlling or directing medical decision-making does not apply to physical therapists, the Settlement Agreement is not contrary to Texas law regarding CPOM.

### 3. Colorado law specifically allows the language in the Parties' Settlement.

Colorado recognizes a CPOM prohibition. However, the statute does not apply to the Colorado Defendant as the statute is limited to hospitals, hospices, community mental health centers, rural clinics, long-term care facilities, and federally qualified health centers. COL. REV. STAT. § 25-3-103.7 (2015). Even if the prohibition applied to the Colorado Defendant, the statute expressly permits the type of restriction outlined in the Settlement Agreement:

> Nothing in this section shall be construed to affect any healthcare facility's decisions with respect to the availability of services, technology, equipment, facilities, or treatment programs, or as requiring any healthcare facility to make available to patients or physicians additional services, technology, equipment, facilities, or treatment programs.

COL. REV. STAT. § 25-3-103.7 (2015).

While a single Colorado case discussed the general CPOM prohibition in Colorado, it did not discuss in detail the above provision. In *Estate of Harper ex rel. Al-Hamim v. Denver Health and Hospital Authority*, the Court generally recognized that Colorado's legislature

codified the CPOM to exclude entities from "vicarious liability for the negligent acts of their medical professionals." 140 P.3d 273, 276 (Colo. App. 2006). The Court noted the general prohibition against entities exercising control over a "physician's independent professional judgment," but did not analyze the permission granted to entities to make determinations about equipment and treatment programs available at their facility. *Id.* at 277. A deeper review of Colorado case law did not reveal a case that has yet applied that provision.

Because Colorado's statutory prohibition against entities controlling or directing medical decision making does not apply to the Colorado Defendant and even if it did, Colorado law expressly permits the entity to control what treatment programs are available at its facilities, the Settlement Agreement is not contrary to Colorado law regarding CPOM.

### 4. The Settlement Agreement's provisions regarding the exclusivity of ASTYM® therapy do not violate CPOM.

The core of Defendants' reasoning regarding the Settlement's exclusivity is that it violates a public policy prohibiting health care entities from overriding health care decisions made by a patient's physician or other health care provider. But Defendants' position conflates improper control of professional judgment with permissible control of a facility's resources. Colorado's statute noted above best highlights this policy distinction. Health care entities may make—and do routinely make—decisions about what equipment and treatment options are available at their facilities. By doing so, an entity is not interfering with a provider's ability to diagnose and treat her patients' ailments, but making permissible decisions about what forms of care may be rendered at the facility.

If Defendants' position were true, every health care facility in any of these states would be mandated by law to provide all state-of-the-art treatment options and equipment—an economically unreasonable and unfeasible proposition. Reality reflects a more reasonable

26

compromise which the Settlement mirrors. Entities may choose what equipment and treatment methods are available at their facilities and if a provider believes something else is required she can treat her patient at a different facility or refer her patient to a provider and facility that can make the prescribed equipment or method available.

Defendants' assertions that CPOM doctrines in Colorado, Texas, Indiana, or Kentucky would void the Settlement entered into by the parties is inaccurate. They misstate the principles of CPOM in those states and misinterpret the statutes as applying to physical therapists. Moreover, as evidenced by Colorado's statute, the language of the Settlement comports with the accepted practices of modern medicine; health care entities can, and do, restrict their available services without dictating how a provider treats a patient.

## V. Conclusion

Based upon the foregoing facts, arguments, and authorities, Plaintiff respectfully requests the Court enforce the Settlement Agreement as agreed upon between the parties on April 20, 2015.

Respectfully submitted this 24th day of November, 2015.


DEFUR VORAN LLP


BY/s/  Scott E. Shockley
Scott E. Shockley #2153-18
Matthew L. Kelsey #29313-49
400 South Walnut Street Suite 200
Muncie, IN 47305
Telephone: 765-288-3651
Facsimile: 765-288-7068
Email: sshockley@defur.com
Email: mkelsey@defur.com
ATTORNEYS FOR PLAINTIFF

/s/  R.Terry Heath
R. Terry Heath #10540-49
HALL RENDER KILLIAN HEATH & LYMAN
One American Square, Suite 2000
Indianapolis, IN 46282
Telephone: 317-633-4884
Facsimile: 317-633-4878-7068
Email: theath@hallrender.com
ATTORNEY FOR PLAINTIFF


CERTIFICATE OF SERVICE

I certify that on the 24th day of November, 2015, a copy of the above and foregoing document was electronically filed through the ECF System, which will send a notice of electronic filing to:

Bryce H. Bennett, Jr.
Nicholas C. Dugan
Riley Bennett & Egloff, LLP
Fourth Floor
141 East Washington Street
Indianapolis, IN 46204

Benjamin C. Fultz
John David Dyche
Kyle G. Bumgarner
Fultz Maddox Hovious & Dickens PLC
101 S. Fifth Street, 27th Floor
Louisville, KY 40202-3116


/s/   Scott E. Shockley
Scott E. Shockley

28