## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

CIVIL ACTION NO. 1:13-cv-00298-WTL-TAB

PERFORMANCE DYNAMICS, INC.                                    PLAINTIFF

v.

TIMOTHY FLYNN; ANDREW BENNETT;
ROBERT WAINNER; LAURENCE BENZ;
COLORADO PHYSICAL THERAPY SPECIALISTS, LLC, PC;
TEXAS PHYSICAL THERAPY SPECIALISTS, PC;
EVIDENCE IN MOTION, LLC                                       DEFENDANTS

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MEMORANDUM BRIEF
## IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AGREEMENT

Defendants Timothy Flynn, Andrew Bennett, Robert Wainner, Laurence Benz, Colorado

Physical Therapy Specialists, LLC, PC, Texas Physical Therapy Specialists, PC, and Evidence in

Motion, LLC submit this response to Plaintiff's Memorandum Brief in Support of Motion to

Enforce Settlement Agreement (Doc. 108).[1]

### I.  INTRODUCTION

The dispute arises from efforts of counsel to negotiate and draft a final, formal settlement

agreement after the parties reached agreement on most, but not all, material issues after a

settlement conference conducted by the Court on April 20, 2015.  The dispute arises from the

following single sentence that was included in a marked-up document that was signed by the

---

[1] Plaintiff purports to submit is Memorandum Brief "pursuant to S.D. Ind. Local Rule A.D.R. 2.6(e)(3) of the United States District Court for the Southern District of Indiana."  (Plaintiff's Memorandum Brief, Doc. 108, at 1). However, as the Court stated in the first paragraph of its Entry Regarding Motion to Enforce Mediation Agreement (Doc. 106), which set the briefing schedule, "Those rules are inapplicable to the mediation agreement in this case, however, as it was reached during a settlement conference with the Magistrate Judge.  *See*, S.D.Ind. Local A.D.R. Rule 1..1(b)("Settlement conferences conducted by Judges and Magistrate Judge[s] of the Court are not governed by these Rules.")."  Accordingly, neither plaintiff's brief nor this one is filed pursuant to those rules.

plaintiff, a representative defendant, and their respective counsel late in the evening at the end of a very long day of intense negotiation at the settlement conference:

**"No other instrumented soft tissue treatment shall be provided at any such facility."**

Plaintiff, Performance Dynamics, Inc. ("PDI"), seeks to enforce that document signed at the end of the settlement conference as a contract despite the fact that the document on its face does not reflect agreement on all essential points. While the parties and their counsel believed they had the basis of a settlement and in good faith so advised the Court, they were in fact somewhat short of an enforceable agreement. And even if the Court finds that there was agreement on all essential terms as required for a contract there are still two major problems with the disputed sentence that preclude its inclusion in a final, formal settlement agreement.

First, inclusion of the sentence would violate public policy. To intrude upon the independent professional judgment of physical therapists by contractually forbidding the use of certain treatments as the disputed sentence requires would violate the professional code of ethics rules under which physical therapists operate and/or the "corporate practice of medicine" doctrine, which prevents business entities from dictating or interfering with the independent professional judgments of practitioners about how best to treat their patients. Even PDI's counsel acknowledged this during discussion of the terms of a final, formal settlement agreement:

> The restriction against corporate owners directing or controlling independent medical acts, decisions, or judgment is embedded to some degree in Indiana law and I'm certain in state codes elsewhere. I see where you're coming from. I doubt we'll have a problem with this issue.

*See* email from PDI's counsel Scott Shockley to defendants' counsel Benjamin C. Fultz dated Friday, June 26, 2015, attached hereto as **Exhibit 1.** But despite PDI's counsel's acknowledgement of the legal restrictions on corporate owners directing or controlling

independent medical acts, decisions, or judgment and his optimism that the parties would not have a problem with that issue, the parties are having a problem with it, and a big one that has thus far defied resolution.  Inclusion of the disputed sentence was, at best, a mutual mistake.

Second, and even assuming the restriction referred to in the disputed sentence was compatible with public policy, there still was no "meeting of the minds" as to, and therefore a mutual mistake about, the meaning, scope, and extent of the term "instrumented soft tissue treatment" as used in the phrase.  This lack of agreement or misunderstanding is evident and indisputable from the language of the preceding sentence (which presupposes that there will be "clinicians providing instrumented soft tissue treatment"), evidence from PDI witnesses, and correspondence between PDI's counsel and the defendants' counsel during the course of their efforts to agree upon the terms of a final, formal settlement agreement.  PDI's counsel acknowledged that the term could not and did not include certain common, non-commercial and non-proprietary techniques, many of which have existed and been used for a very long time.  Despite this express acknowledgement, however, PDI still refused to include this clarification, or any other definition of the term, in a final, formal settlement agreement.  PDI has further refused to state whether a procedure shown on a video provided by defendants' counsel would or would not be within the scope of the phrase.  These refusals suggest that PDI's overarching purpose is not a compromise that reflects and protects each side's legitimate interests, but is rather, as it has been from the outset, to use invalid, overbroad, and unenforceable agreements to improperly monopolize the market for instrumented soft tissue mobilization in the physical therapy market.

The defendants and their counsel acknowledge that the disputed sentence should have been either struck from the document that was signed at the conclusion of the settlement conference or that document revised before signature so as to make the reference to the use of

other "instrumented soft tissue treatment" subject to the "recommend and encourage" modifying language that was handwritten in the margin of the document nearby the sentence with a line running from the modifying language to another area of the paragraph containing the disputed sentence.  This is supported by the preceding sentence in the document, which as modified, says that the defendants shall "recommend and encourage that *all clinicians providing instrumented soft tissue treatment at any of those facilities*" be trained in ASTYM and maintain ASTYM certification.  This very sentence presupposes that there will be clinicians at those facilities providing instrumented soft tissue treatment and thus contradicts the disputed sentence. (Plaintiff's Memorandum Brief, Doc. 108-1, at Ex. 1, Page 1 of 7).

However, counsel for the defendants orally advised all other persons at the mediation, including the Magistrate Judge, PDI's representatives, and PDI's counsel, that the defendants could not and would not agree to any provision in any settlement agreement that would limit the use of treatments that individual physical therapists in their professional judgment deemed necessary and appropriate for their patients.  *See* Affidavit of Benjamin C. Fultz, attached hereto as **Exhibit 2.**

However, the circumstances at the end of the long and tiring settlement conference were such that what the Seventh Circuit has called the "standard practice" that "should be followed in all cases" of dictating the terms of the settlement on the record was dispensed with, and neither the defendants nor their counsel noted the retention of the disputed sentence in the document without modification.  *Lynch, Inc. v. SamataMason, Inc.*, 279 F.3d 487, 490-91 (7th Cir. 2002). But for the reasons set forth above, the disputed sentence cannot be in a final, formal settlement agreement regardless.

## II.  BACKGROUND

PDI claims that it has developed a proprietary system of tools-based physical therapy known as "Astym" or "ASTYM" treatment.  The defendants acknowledge, as they always have, that ASTYM has certain merits and utility for the physical therapy practitioner and can assist some patients.  But it is not by any means the only beneficial kind or form of instrument assisted soft tissue mobilization method and it partakes liberally of generally known and pre-existing techniques.   As PDI's Medical Director, Dr. Thomas L. Sevier, has admitted on multiple occasions (and as is discussed in greater detail below), PDI's ASTYM is one part of the larger field of physical therapy known as instrument assisted soft tissue mobilization, sometimes referred to as "IASTM" or "ISTM" techniques.

Contrary to what PDI asserts, defendants Bennett and Flynn did have pre-existing knowledge and training in IASTM methods other than ASTYM.  (Plaintiff's Memorandum Brief, Doc. 108, at 4).  The IASTM methods taught and used by these defendants were therefore not an "imitation" of ASTYM or "knock off ASTYM" as PDI incorrectly asserts, but rather IASTM methods generally known and widely used separate and apart from ASTYM.  (Plaintiff's Memorandum Brief, Doc. 108, at 6).  No matter how much PDI protests to the contrary, ASTYM is clearly and merely one variety of IASTM, many of which existed and were in widespread use by defendants Bennett and Flynn and myriad other physical therapists long before PDI developed and marketed ASTYM.

PDI alleges that because Bennett and Flynn received training in ASTYM they are bound by certain restrictions in the Service Agreements and Acknowledgements they signed.  Among other things, these restrictions purport to require them to keep the ASTYM system confidential and prohibit them from teaching any form or kind of IASTM, including even those varieties of

IASTM that are indisputably separate and distinct from ASTYM and which they knew and were using before they got ASTYM training.

PDI claims that in late 2012 it learned of a seminar sponsored by defendant Evidence in Motion, LLC ("EIM") in Falls Church, Virginia, with Bennett and Flynn on the faculty, and IASTM on the curriculum.  With the seminar scheduled and EIM accepting registrants, PDI's general counsel wrote to Bennett and Flynn advising them of her belief that they would violate the terms of their Service Agreements and Acknowledgments if they taught IASTM at the Falls Church seminar.  Bennett and Flynn shared the letter with defendants Benz and Wainner and sought their guidance.  Benz and Wainner advised Bennett and Flynn to proceed with the seminar as planned. And, as they had already committed to do, Bennett and Flynn went on to teach IASTM at Falls Church.  In teaching IASTM, PDI alleges that Bennett and Flynn taught techniques that were or were impermissibly similar to the ASTYM treatment, which all defendants emphatically deny.

As defendants argued in their partial motion to dismiss that was pending at the time of the settlement conference (Doc. 71), PDI cannot enforce the overbroad and unreasonable provision in the Acknowledgements that purports to prohibit defendants Bennett and Flynn from "train[ing], instruct[ing] or advis[ing] anyone in the performance of" IASTM *forever*.  Whether that provision is analyzed as a covenant not to compete or a confidentiality agreement, it is unenforceable as a matter of law.  The covenant purports to prohibit the teaching IASTM techniques that are publicly available and not a part of the ASTYM system.  As such, the covenant is overly broad, unenforceable and a restraint on trade intended to monopolize the IASTM market.  *See*, *e.g.*, *Bodemer v. Swanel Beverage, Inc.*, 884 F. Supp. 2d 717, 736 (N.D. Ind. 2012) (striking down restrictive covenant containing no temporal limitation).

Moreover, the defendants have not taught ASTYM, and each of the techniques defendants Bennett and Flynn taught are commonly recognized in the general field of IASTM, and are not unique to the ASTYM system.  The defendants are prepared through expert testimony and publicly available sources to establish that ASTYM is not a "trade secret" as that term is defined by the Indiana Trade Secrets Act.  PDI's trademark infringement claims based on the defendants' use of the term "ISTM" is likewise flawed.  PDI cannot establish that the defendants' use of "ISTM" was likely to cause confusion as to the source of the goods or services.  Physical therapists well-versed in the various and distinct forms of IASTM are easily able to distinguish the terms and the techniques.  And the defendants would prevail on a fair-use defense because, as PDI's Dr. Sevier has admitted, the term "ISTM" is the "shortened name" for the technique of instrument assisted soft tissue mobilization, and not a mark.

There had been some discovery at the time of the settlement conference, but the defendants had not been deposed or asked to explain documents they produced which PDI in its brief attempts to mischaracterize as incriminating.  (Plaintiff's Memorandum Brief, Doc. 108, at 9-10).  PDI had produced a witness who claimed that Bennett and Flynn taught ASTYM techniques at EIM's Falls Church seminar, but that witness was affiliated with PDI and not independent.  As noted, the defendants were prepared to offer independent witnesses to testify that what Bennett and Flynn had taught at the seminar was not ASTYM, but rather generally known and widely used techniques of the broader and pre-existing field of IASTM.

This is how things stood at the time of the settlement conference.  Extensive deposition and expert discovery was about to begin and each side had a risk of loss.  PDI apparently believed it could prevail on its claims, but it also faced the prospect of having the restrictive covenant upon which it relied declared invalid, its purportedly proprietary and trade secret

techniques declared generally known and publicly available, and its monopolistic business model struck down. So the parties undertook to negotiate a settlement.

While reviewing the documents PDI's counsel circulated before the settlement conference, defendants counsel marked out the disputed sentence by putting an "X" through it and wrote "No. Can't do that," or words to that effect, next to it in the margin. Throughout the day at the settlement conference, the parties had multiple sessions that included the lawyers and the clients. When discussing the disputed sentence, the defendants' counsel told the participants that the defendants could not agree to anything that would interfere or control the therapists' independent professional judgment. He further explained that the ethical prohibitions that he was describing are sometimes codified or recognized in a doctrine known as the "corporate practice of medicine." The defendants' counsel advised the participants that while the defendants could not ethically agree to any such provision they could agree to "recommend and encourage" the use of ASTYM. *See* Affidavit of Benjamin C. Fultz, attached hereto as **Exhibit 2.**

### III. ARGUMENT

**A. No Contract Exists to Enforce Because No Agreement on Some Essential Terms**

PDI acts as if there is no dispute as to the existence of a contract that the Court can enforce. However, there is a dispute on this fundamental issue. PDI does not attempt to meet, much less actually meet, its burden of establishing the existence of an enforceable a contract.

"Issues regarding the formation, construction, and enforceability of a settlement agreement are governed by local contract law." *Pohl v. United Airlines, Inc.,* 213 F.3d 336, 338 (7th Cir.2000) (citation omitted). "The failure to demonstrate agreement on essential terms of a purported contract negates mutual assent and hence there is no contract." *Ochoa v. Ford,* 641

N.E.2d 1042, 1044 (Ind. Ct. App.1994) (citation omitted).  In fact, "If a party cannot demonstrate agreement on *one* essential term of the contract, then there is no mutual assent and no contract is formed."  *Schuler v. Graf,* 862 N.E.2d 708, 715 (Ind. Ct. App. 2007) (emphasis added).

The parties and their counsel did in fact believe that after the settlement conference that they had the basis of a settlement.  They knew, however, that after the adjournment of the settlement conference there were still multiple material terms to be agreed upon.  They also knew that they would also have to agree on how to embody all terms in a definitive, final, formal settlement agreement.

The Court need only look at the document that was signed that evening (Doc. 108-1) to see that the parties did not agree on all essential terms as is necessary to form and enforceable contract.  For example, in the paragraph originally numbered 4, but renumbered in handwriting as 1 on PageID #798 there is a reference to a "sum" to be paid by the defendants, but there is no actual amount.  Also, in paragraph 9 on PageID #799, there is a statement, "This is where arbitration language should be added," but there is no indication of what is to be arbitrated, by whom, or on what terms.  In the marked-up injunction that was to be a part of the final, formal settlement, on PageID #803, there is another reference to an "agreed upon arbitrator," but there is also a handwritten notation to "Add actual name when drafting," which shows that there was not agreement at that time and the identity of the arbitrator was an essential term that remained to be negotiated and agreed on.

Thus, while the current dispute between the parties has focused on the single disputed sentence set forth above, as a more fundamental matter there is no contract for the Court to enforce because the document upon which PDI relies as a contract does not demonstrate agreement on multiple essential terms.  This failure negates mutual assent and hence there is no

contract.  The fact that the parties and their counsel in good faith believed that they could and would arrive at agreement on those terms as part of the process of negotiating and drafting a formal settlement agreement, and therefore indicated to the Court that the case was settled, neither changes this fact nor alters its legal effect.  Because PDI cannot demonstrate agreement on other essential terms of the contract, then there is no mutual assent and no contract was formed that the Court can now enforce.

### B.  Disputed Sentence Would Violate Public Policy and Be a Mutual Mistake

PDI does not dispute that under Indiana law a court can refuse to enforce a contract on public policy grounds when the contract contravenes a statute, tends to injure the public in some way, or is otherwise contrary to public policy.  *Wright v. City of Gary*, 963 N.E.2d 637, 649 (Ind. Ct. App. 2012).  Whether a contract is against public policy in a particular situation is a question of law dependent on the circumstances of the particular case. *Trotter v. Nelson,* 684 N.E.2d 1150, 1152–53 (Ind.1997); *Hi-Tec Properties, LLC v. Murphy*, 14 N.E.3d 767, 773 (Ind. Ct. App. 2015) *transfer denied,* 20 N.E.3d 851 (Ind. 2014); *Devereux v. DiBenedetto*, No. 49A02-1411-CT-780, 2015 WL 6777121, at *3 (Ind. Ct. App. Nov. 6, 2015).  Contract provisions are unenforceable under Indiana law, for example, when they are "overly broad and unreasonable in light of the interests sought to be protected."  *Bodemer*, 884 F. Supp. 2d at 736;  *Coll. Life Ins. Co. of Am. v. Austin,* 466 N.E.2d 738, 744 (Ind.Ct.App.1984) ("[W]hatever restraint is larger than necessary for the protection of the party, is void, as being injurious to the interests of the party."); *see also  Dearborn v. Everett J. Prescott, Inc.,* 486 F.Supp.2d 802, 816 (S.D.Ind.2007) (noting that Indiana has "a public policy against contracts that unreasonably restrain trade."); *Fumo v. Med. Grp. of Mich. City, Inc.,* 590 N.E.2d 1103, 1109 (Ind.Ct.App.1992).

When Indiana courts consider arguments that a contract is contrary to public policy, the realm of public policy they consider is not limited to what is expressly stated in statutes. They consider "the surrounding circumstances of a given case," and if the public policy is not explicit, they consider "the overall implications of constitutional and statutory enactments, practices of officials and judicial decisions to disclose the public policy of this State." *Straub v. B.M.T.,* 645 N.E.2d 597, 599 (Ind.1994). The Indiana Supreme Court has identified the following factors it considers in cases challenging a contract or contract provision on public policy grounds when there is not a statutory prohibition or tendency to injure the public: (1) the nature of the subject matter of the contract; (2) the strength of the public policy underlying any relevant statute; (3) the likelihood that refusal to enforce the bargain or term will further any such policy; (4) how serious or deserved would be the forfeiture suffered by the party attempting to enforce the bargain; and (5) the parties' relative bargaining power and freedom to contract. *Dearborn v. Everett J. Prescott, Inc.*, 486 F. Supp. 2d 802, 814-15 (S.D. Ind. 2007).

In this case there are multiple sources of public policy that prohibit the inclusion of the disputed sentence in the settlement agreement. For example, professional ethical codes can provide the basis for a public policy claim. *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 524-25 (Colo. 1996); *Rich v. Simoni*, 235 W. Va. 142, 772 S.E.2d 327, 336 (2015) ("we hold that professional ethical codes may in certain circumstances be a source of public policy"); *Hitesman v. Bridgeway Inc.*, 430 N.J. Super. 198, 218, 63 A.3d 230, 242 (App. Div. 2013) *aff'd*, 218 N.J. 8, 93 A.3d 306 (2014) ("In certain instances, a professional code of ethics may contain an expression of public policy"); *Delaney v. Signature Health Care Found.*, 376 S.W.3d 55, 56 (Mo. Ct. App. 2012) (recognizing "professional codes of ethics" as potential source of public policy exception to otherwise applicable legal doctrine); *LoPresti v. Rutland*

*Reg'l Health Servs., Inc.*, 2004 VT 105, ¶ 23, 177 Vt. 316, 327, 865 A.2d 1102, 1112 (2004) ("We agree, as a general matter, with those courts that accept professional ethical codes as potential sources of public policy").

Therefore, one such source of public policy in this case is the Code of Ethics of the Physical Therapist, which "delineates the ethical obligations of all physical therapists as determined by the House of Delegates of the American Physical Therapy Association" ("APTA Code of Ethics"). A copy of the APTA Code of Ethics is attached as **Exhibit 3**. Principle #3 of the APTA Code of Ethics is that, "Physical therapists shall be accountable for making sound professional judgments." Principle #3.A provides that, "Physical therapists shall demonstrate independent and objective professional judgment in the patient's/client's best interest in all practice settings." Principle #3.D requires that, "Physical therapists shall not engage in conflicts of interest that interfere with professional judgment." Principle #7 states that, "Physical therapists shall promote organizational behaviors and business practices that benefit patients/clients and society." Principle #7A provides, "Physical therapists shall promote practice environments that support autonomous and accountable professional judgments."

The disputed sentence would compromise the independent and objective professional judgment of the affected physical therapists by dictating what IASTM therapy methods and techniques they can and cannot use. It would also compromise the independent and objective professional judgment of the affected physical therapists by compelling them to send patients elsewhere for non-ASTYM methods of IASTM, even if in their independent and objective professional judgment it was best for the patient to get that treatment from them. PDI repeatedly asserts that the disputed sentence merely "restrict[s] their available service without dictating how a provider treats a patient," but restricting available services that physical therapists can provide

itself compromises their sound, independent, and professional judgments and puts them in an impermissible conflict of interest between their employer and their patients. Thus, the disputed sentence is unenforceable as against public policy because it violates the APTA Code of Ethics in at least these ways.

Another source of public policy that prevents the defendants from agreeing to inclusion of the disputed sentence in the settlement agreement is the corporate practice of medicine doctrine. The corporate practice of medicine arises from state statutes, common law, and public policy arguments. It applies in various forms in each of Indiana, Colorado, and Texas (which are the forum state for this case and the states in which certain of the defendants practice physical therapy), as well as in most other states. *See Corporate Practice of Medicine: 50-State Survey*, AHLA HEALTH LAW UPDATE AND ANNUAL MEETING SEMINAR MATERIALS (American Heath Lawyers Association, Washington D.C.), June 05, 1996.

"The corporate practice of medicine doctrine requires that all medical decisions be made by licensed medical professionals." Jessica A. Axelrod, *The Future of the Corporate Practice of Medicine Doctrine Following Berlin v. Sarah Bush Lincoln Health Center*, 2 DEPAUL J. HEALTH CARE L. 103, 103 (Fall 1997). It is "a common law principle that recognizes it is impossible for a fictional entity, a corporation, to perform medical actions or be licensed to practice medicine." *Harper v. Denver Health and Hospital Authority*, 140 P.3d 273, 276 (Col. Ct. App. 2006). "Under this doctrine, a corporation may not employ physicians, perform medical services, *or interfere with a physician's medical judgment.*" *Id.* (emphasis added).

The core concern of the doctrine is to protect the practitioner's "professional autonomy from lay interference or commercial exploitation." Catherine I. Hanson, *The Corporate Practice of Medicine and Integrated Delivery Systems: A Collision Course?*, AHLA-PAPERS

P11019313 (Nov. 1, 1993).  In other words, it is designed to "protect[ ] physician-patient relationships from being undermined by the intrusion of a lay corporation not bound by medical ethics."  Axelrod, *supra*.  It also prevents employee practitioners from feeling a divided sense of loyalty between the profit-seeking employer and the treatment-seeking patient.  *Id.*

The Indiana, Colorado, and Texas legislatures have each enacted statutes that prohibit the corporate practice of medicine.  IC 24-22.5-1-2; Tex. Occ. Code Ann. 164.052 §; *Gupta v. E. Idaho Tumor Institute, Inc.*, 140 S.W.3d 747, 752 (Tex. Ct. App. 2004) ("Under the Medical Practices Act, when a corporation comprised of lay persons employs licensed physicians to treat patients and the corporation receives the fee, the corporation is unlawfully engaged in the practice of medicine"); Colo.Rev.Stat. § 12-36-134.  For example, Colorado's general statute explicitly states that a corporation cannot "exercise any authority whatsoever over the independent medical judgment" of practitioners.  Colo.Rev.Stat. § 12-36-134.  Similarly, Indiana's statue prohibits corporations from directing or controlling independent medical acts of practitioners.  IC § 24-22.5-1-2.

As to Indiana, PDI acknowledges that Indiana law "arguably included the practice of physical therapy within the definition of the "practice of medicine" for purposes of I.C. § 25.22.5.  (Plaintiff's Memorandum Brief, Doc. 108, at 23).  PDI further acknowledges that under I.C. § 25-22.5-1-2(a) and (c), a "health care organization whose members, shareholders, or partners are individuals, partnerships, corporations, facilities, or institutions licensed or legally authorized by this state to provide health care or professional services as … a physical therapist" may "not direct or control independent medical acts, decisions, or judgment of" its employee practitioners.  (Plaintiff's Memorandum Brief, Doc. 108, at 23-4).  PDI contends, however, that despite the inclusion of physical therapists in I.C. § 25-22.5-1-2(a), the prohibition in I.C. § 25-

22.5-1-2(c) does not apply to physical therapist employees of entities owned by physical therapist, but only to "licensed physician" employees of such entities.  PDI makes essentially the same argument as to Texas, which it also concedes as having  a "statutory prohibition against entities controlling or directing medical decision-making," but which it says "does not apply to physical therapists.  (Plaintiff's Memorandum Brief, Doc. 108, at 25).

This makes no sense, however, since the rationale for the doctrine is the same for physical therapists as for physicians.  PDI acknowledges that there are no Indiana or Texas cases on point or applying or reviewing the relevant statutes in this regard.  (Plaintiff's Memorandum Brief, Doc. 108, at 24-5).  However, Indiana's corporate practice of medicine doctrine has been extended to apply to dentists, and there is no reason to believe a court would not similarly extend Indiana's corporate practice of medicine doctrine to a corporation employing physical therapists. *See* Affidavit of Myra C. Selby, attached hereto as **Exhibit 4.**  Other states have held corporate practice of medicine restrictions applicable to physical therapy.  For example, the Iowa Attorney General as well as the New York State Board of Physical Therapy have stated that the doctrine prohibits the corporate practice of physical therapy.  Iowa Op. Att'y Gen. No. 74–9–4 (Sept. 4, 1974); New York State Education Department, *Corporate Practice of the Professions* (1998).

Regardless, the disputed language could nevertheless cause the physical therapist defendants and the physical therapists with whom they practice to violate Indiana's unlawful practices of physical therapy statute.  Indiana explicitly prohibits a person to practice physical therapy other than upon order or referral of a physician, podiatrist, psychologist, etc. holding an unlimited license to practice medicine, podiatric medicine, psychology, etc.  Ind. Code § 25-27-1-2(b).  The disputed language would restrict the type of treatment and devices therapists can provide to their patients to solely ASTYM treatments or devices.  However, a physical therapist

can only practice physical therapy consistent with another medical professional's orders.  It is easy to imagine a scenario where a medical professional orders a treatment that is not ASTYM. If the defendant therapists are bound by this language, the physical therapists could not comply with the medical professional's order, and therefore would have to ignore the order.  However, it is expressly unlawful under Indiana law for a physical therapist to do so.  Accordingly, the disputed language could put the physical therapist defendants in the untenable position of breaching the settlement or violating their legal and ethical obligations to their patients.  *See* Affidavit of Myra C. Selby, attached hereto as **Exhibit 4.**

In Colorado, in addition to the restrictions generally applicable to the practice of medicine listed above, a specific statute prohibits, with limited exceptions, the corporate practice of physical therapy.  Colo.Rev.Stat. § 12–41–124(5).  It expressly provides that, "Nothing in this section diminishes or changes the obligation of each person licensed to practice physical therapy employed by the corporation to practice *in accordance with the standards of professional conduct* under this article and rules adopted under this article."  Colo. Rev. Stat. Ann. § 12-41-124 (emphasis added).  The statute to which PDI refers as expressly permitting "the type of restriction outlined in the Settlement Agreement" (Colo.Rev.Stat. § 25-3-103.7) relates to hospitals and other health care facilities not including physical therapy practices, and therefore does not does not apply, much less control, this non-hospital situation.

The defendants would clearly violate the APTA Code of Ethics and would likely violate the corporate practice of medicine doctrine if they entered an agreement such as this one that prohibited their clinicians from exercising their own independent medical judgment in treating patients.  Their clinicians must be free to use whatever form of IASTM they in an exercise of independent professional judgment believe is best suited to treat their patients' needs.  An

16

agreement that would require defendants' clinicians to use ASTYM to the exclusion of all other forms of instrumented soft tissue treatment places limits on the clinician's independent medical judgment and, thus, cannot be enforced.

It is not enough to suggest, as PDI repeatedly does, that under the disputed sentence the affected entities are simply regulating the services they offer because that is just another form of intruding into the practitioner-patient relationship as the professional code of conduct and the laws do not allow.  The disputed restriction is not limited to control of the facility or resources within a facility because by its very terms it operates at the level of the physical therapist's professional judgment about what is best for the patient/client.  *See* Affidavit of Myra C. Selby, attached hereto as **Exhibit 4.**

To the extent the Court concludes that the parties both knowingly and intentionally agreed to the disputed sentence despite its legal implications, their doing so constitutes a mutual mistake sufficient to set aside a contract.  *Callen v. Pennsylvania R. Co.*, 332 U.S. 625, 630, 68 S. Ct. 296, 298, 92 L. Ed. 242 (1948).

### C.  No Meeting of the Minds on Meaning of "Instrumented Soft tissue Treatment"

"A meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract."  Determining whether there has been a meeting of the minds "is a factual matter to be determined from all the circumstances," and the Court should refer "not to the parties' subjective intents but their outward manifestation of it."  *Zimmerman v. McColley,* 826 N.E.2d 71, 77 (Ind. Ct. App. 2005).  When the party seeking to enforce a purported settlement agreement cannot demonstrate agreement and a "meeting of the minds" on the meaning of a material term a federal court applying Indiana law should deny enforcement of the

purported agreement.  *See, e.g., Rosco v. Equifax Info. Servs., Inc.*, No. 1:14-CV-141, 2015 WL 5613203, at *6 (N.D. Ind. Sept. 24, 2015).

Here, there was no "meeting of the minds" as to the meaning of the term "instrumented soft tissue treatment" as used in the disputed sentence.  Without a definition, term "instrumented soft tissue treatment" is ambiguous because "reasonable persons could differ as to the meaning of its terms."  *IP of A West 86th Street 1, LLC v. Morgan Stanley Mortgage Capital Holdings, LLC*, 686 F.3d 361, 368 (7th Cir. 2012) (applying Indiana law).  PDI's Dr. Sevier has issued multiple public statements that reflect the broad variety of IASTM and the difference between IASTM and PDI's ASTYM methods or techniques that are a subset within the much wider and pre-existing set of IASTM.

Among Dr. Sevier's statements are the following:

- "There is a significant difference between Astym treatment and instrument assisted soft tissue mobilization (IASTM) techniques, such as Graston, Sastm and other tooled friction massage . . . Although Astym treatment evolved from research on manual therapies, including friction massage, it is very different than friction massage, *and its variation, tooled friction massage.*  Tooled friction massage is often referred to as instrument assisted soft tissue mobilization or IASTM, and is also referred to by the brand of IASTM, such as Graston Technique or Sastm."  *From Sevier's blog, "Astym v. IASTM (Graston, Sastm, etc.): How They Are Different."*

- On recognizing that IASTM developed out of soft tissue mobilization – "Recently, tools have been added to soft tissue mobilization which is called IASTM or Instrument Assisted Soft Tissue Mobilization."  This post includes a chart outlining the differences between IASTM and ASTYM.  *From Sevier's blog, "Astym and Soft Tissue Mobilization are Very Different."*

- Dave Graston coined the term IASTM "as a generic category for Graston and the other technique he came up with, sound assisted soft tissue mobilization." *From Sevier's blog, "Astym and IASTM: Background and Differences."*

Likewise, PDI's witness Suzie Freeman also repeatedly admitted in her deposition that IASTM and ASTYM are different and that there are myriad manifestations of IASTM:

- She agreed that IASTM stands for instrument assisted soft tissue mobilization (40:5-8)

- She agreed that IASTM sometimes goes by particular brands such as Graston and Fibroblaster (40:20-22)

- She agreed that westernized gua sha has often been called IASTM (40:23-25)

- She agreed that IASTM techniques vary in how they are done (41:4-5)

- She claims that the only commonality between IASTM and ASTYM is that they both use tools (42:5-12)

- She admitted that ASTYM relies on third-party sources as part of the ASTYM process (45:2-7), which shows that ASTYM's entire process is not original and unique

- She claims that Graston is a form of IASTM, but not ASTYM (48:14-20)

Thus, PDI is simply incorrect in suggesting that the parties "understood what 'instrumented soft tissue treatment' means perfectly well" even without a clarifying definition. (Plaintiff's Memorandum Brief, Doc. 108, at 1).  Actually, there was no clarifying definition in the document signed at the settlement conference because one is not needed if the disputed sentence is subject to the recommend and encourage language referred to above, as at least the defendants believed it was.  During the course of discussions and negotiations about the actual terms of a final, formal settlement agreement, however, PDI's counsel acknowledged, however, that the term "'instrumented soft tissue treatment" could not and did not include certain common, non-commercial and  non-proprietary techniques, many of which have existed and been used for a very long time.  Despite this express acknowledgement, however, PDI's counsel refused to include this clarification or any other definition of the term in a final settlement agreement.

Counsel for the defendants proposed clarifying language for the settlement agreement that would serve PDI's stated purpose while also allowing finalization of a settlement agreement

19

that reflects an actual meeting of the minds as to the term "instrumented soft tissue treatment."

That language was:

> No other proprietary or commercial soft tissue treatment shall be provided at any such facility.  Notwithstanding the foregoing, PDI acknowledges and agrees that the individual therapists may use generic, non-proprietary or non-patented instruments that he or she deems appropriate, in his or her professional judgment, for the treatment of the patient, including but not limited to foam rollers, therapy balls, puddy, common cans (such as soup from a grocery store), roller balls, and knob handles.

*See* email from defendants' counsel Benjamin C. Fultz to PDI's counsel Scott Shockley dated

Thursday, August 27, 2015, attached hereto as **Exhibit 5.**  PDI refused this language, but said it

would never try to enforce the injunction against such techniques.  Counsel for the defendants

continued the exchange:

> I don't understand why you are willing to concede that those instruments are not covered by the prohibition but aren't willing to draft accordingly.  If you're not willing to revise the language, are you willing to enter into a letter agreement setting forth that understanding or interpretation?  As we've discussed, I don't want my clients to be in default with the broad language of the agreement, but that you concede has nothing to do with the subject matter of the litigation or the agreement reached at the settlement conference.  And if you have no intention of enforcing the broad language, why can't we come to some type of agreement on that?

(Plaintiff's Memorandum Brief, Doc. 108-5, at Ex. 6, Page 2 of 6).

Still, however, even as it acknowledges in correspondence that those enumerated

activities are not within the scope of the term "instrumented soft tissue treatment" as it

understands it, PDI is unwilling to either accept that language as part of the final, formal

settlement agreement or enter into a separate letter agreement to confirm the agreement and

understanding of the parties on the point.  And, as noted above, PDI also declined to indicate

whether a procedure shown on a video provided by the defendants was or was not within the

scope of the term.  This suggests that PDI's overarching purpose is not a compromise that

reflects and protects each side's legitimate interests, but is rather, as it has been from the outset, to use invalid, overbroad, and unenforceable agreements to improperly monopolize the market for instrumented soft tissue mobilization.  There has quite simply not been a meeting of the minds on this issue.

## IV.  CONCLUSION

The Court should deny PDI's Motion to Enforce Mediation Agreement (Doc. 104) outright or set this matter for an evidentiary hearing.  At the hearing the defendants anticipate calling witnesses including defendant Benz, defendants' attorney Benjamin C. Fultz, and perhaps one or more expert witnesses.  These witnesses would testify as to the applicable professional ethical obligations, the settlement conference and subsequent negotiations, IASTM, the disputed sentence and its implications under the corporate practice of medicine doctrine, and the issues discussed in this brief and the supporting exhibits.  The defendants anticipate that their evidence at such a hearing would require about an hour to an hour and a half of time to present.

Respectfully submitted,

s/ Benjamin C. Fultz
Benjamin C. Fultz  #17040-10
John David Dyche (admitted *pro hac vice*)
FULTZ MADDOX DICKENS PLC
101 S. Fifth Street, 27th Floor
Louisville, Kentucky  40202-3116
Phone:  (502) 588-2000
Facsimile: (502) 588-2020

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on December 31, 2015, I electronically filed the foregoing document

through the CM/ECF System, which will send a notice of electronic filing to all counsel of

record.

s/  Benjamin C. Fultz_____

*Counsel for Defendants*
