UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

PERFORMANCE DYNAMICS, INC.
an Indiana Corporation,
      PLAINTIFF,                       CASE NO. 1:13-cv-00298-WTL-TAB

v.

TIMOTHY W. FLYNN; ANDREW BENNETT;
ROBERT WAINNER; LAURENCE BENZ;
COLORADO PHYSICAL THERAPY
SPECIALISTS, LLC, P.C., a Colorado
Limited Liability Company; TEXAS PHYSICAL
THERAPY SPECIALISTS, PC, a Texas
Professional Corporation; and
EVIDENCE IN MOTION, LLC, a Kentucky
Limited Liability Company,
      DEFENDANTS.

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
## MOTION TO ENFORCE MEDIATION AGREEMENT

Performance Dynamics, Inc. ("PDI"), Plaintiff, by counsel, respectfully submits this

Reply Brief in Support of Plaintiff's Motion to Enforce Mediation Agreement:

### I. Introduction

This dispute is about one issue:  whether or not a sentence in a freely bargained written

settlement agreement executed by the parties at the conclusion of a settlement conference

supervised by a Magistrate Judge of this Court violates the law, or would require Defendants to

violate the law, if they comply with it.  The sentence at issue reads, "No other instrumented soft

tissue treatment shall be provided at any such facility," (the **"Disputed Sentence"**).  The

Defendants signed the agreement; thus, we suggest it is their burden to show that something they

agreed to nevertheless violates the law.

1

Instead of focusing directly on the Disputed Sentence, Defendants now, for the first time, introduce issues suggesting a lack of proper contract formation.  In so doing, Defendants substantially misstate the history and content of the settlement agreement.  This discussion is a distraction, intended to introduce alleged new, but non-existent, issues that require a reply but which distract everyone from the single issue presented here.

This brief will first demonstrate that Defendants' contentions alleging a lack of contract formation are frivolous.  Second, Plaintiff will show that inclusion of the Disputed Sentence in the settlement agreement was not a mutual mistake as the Defendants allege, but rather a purposeful part of the negotiation process as set forth in detail in the Plaintiff's opening brief. (See Dkt. 108, pp. 9-11). The Plaintiff made no mistake, and has been clear about that.  Third, Plaintiff will explain that Defendants completely misapprehend the types of ethical codes that may be relevant to a "public policy" objection to a contractual provision.  Finally, Plaintiff will respond to Defendants' contention that the sentence in dispute violates the law.

Before turning to those arguments, however, PDI deems it important to respond to the contention at p. 2 of the Introduction section of the Defendants' Response To Plaintiff's Memorandum Brief in Support of Motion to Enforce Settlement Agreement (the "Defendants' Response Brief" or "the Response") that Plaintiff's counsel, at one time, agreed with their position on this issue.  To attempt to demonstrate this, Defendants insert a block quote from an e-mail Mr. Shockley sent to Mr. Fultz on June 26, 2015.  The Fultz affidavit (Dkt. 112-2) makes no attempt to put this in context.  As Plaintiffs already illustrated in their opening brief, Mr. Fultz took the April 20 Settlement Agreement and volunteered to create a proper document for the parties to execute.  On June 4, 2015, Mr. Fultz sent his draft, but he had edited out the key sentence without mentioning to opposing counsel anything about this change.  (See Ex. 1, Fultz

covering e-mail of June 4, 2015 and attached draft of a proposed settlement agreement). Mr. Shockley responded on June 11, 2015 with a red-lined response to the June 4 draft in which various typo or stylistic changes were made, and one material change - - revising Section 6 to include the Disputed Sentence agreed upon on April 20. Mr. Fultz then called Mr. Shockley to indicate he had removed the sentence because he believed it violated the corporate practice of medicine doctrine ("CPM").

Mr. Shockley is a trial lawyer who emphasizes commercial litigation, among other things. He is not, nor does he hold himself out to be, a health care lawyer. During the preceding two years of this litigation, Mr. Shockley had come to know that Mr. Fultz was primarily a health care lawyer. So, when Mr. Fultz suggested the sentence might violate the law, Mr. Shockley was willing to listen. During the telephone conference, Mr. Shockley asked Mr. Fultz to send some authority or research so he could discuss it with his client. But before Mr. Fultz sent anything, Mr. Shockley briefly consulted Indiana law and found the restriction about physicians, and as a result wrote Mr. Fultz that e-mail which simply indicates he (Shockley) had "found enough information to discuss the corporate practice of medicine issue with my clients" (Dkt. 112-1). Mr. Shockley then promptly consulted with PDI's General Counsel Amy White, who is generally familiar with health care law and did not find merit in the Defendants' argument. Ms. White was, and is, of the opinion that Mr. Fultz was wrong. Ms. White wrote a detailed explanation of her reasoning, which Mr. Shockley sent word-for-word to Mr. Fultz on June 29 with the explanation that this is PDI's position, written by its General Counsel, "who understands the issue far better than I do." (See Ex. 2, Affidavit of Amy White (hereafter "White") and Ex. 3, June 29, 2015 e-mail from Shockley to Fultz).

3

Despite this, Mr. Fultz still disagreed.  At this point, as already explained in detail in the history of the issue in Plaintiff's Opening Brief, Plaintiff engaged a health care law expert (R. Terry Heath) in Indiana, who advised that the Disputed Sentence did not violate the CPM doctrine, and the dispute continued unresolved. (See Dkt. 108, pp. 13-15).  Properly understood, the June 23 e-mail was simply an acknowledgement that Plaintiff's counsel now had a sufficient understanding of the issue to discuss it with his client without further input from Mr. Fultz and that PDI's representatives would get back in touch to discuss it with him.  This was simple lawyerly communication from one attorney to the other that it was believed he had enough information to discuss with the client the new issue Mr. Fultz had raised, and nothing more.

## II. Argument

### A.  Contract Formation

#### (1) Alleged Absence of Essential Elements

Defendants allege that the April 20 Agreement lacked at least two essential elements, and thus "there is no contract for the Court to enforce."  (Dkt. 112, p. 9).  This contention is simply wrong and boldly misstates what the documents say.  It is unexpected and surprising to see Defendants even make such an objection, given the content of the actual document.

#### (a) Lack of an Agreed Sum to be Paid

Defendants allege that the agreement lacks assent as to the sum of money to be paid in renumbered paragraph 1 of the document executed on April 20 in Judge Baker's chambers. (Dkt. 108-1).  As Defendants well know, the sum that was agreed upon was $85,000.00 and that number was contained in renumbered paragraph 1 in the document executed by the parties on April 20, 2015.  In subsequent exhibits filed with the Court,  that number was redacted out of courtesy to the Defendants and to maintain confidentiality as to an issue not deemed material to

this dispute.[1]   However, since Defendants have made this argument, attached as Exhibit 4 is the unredacted first page of the original agreement reciting $85,000.00 and bearing the signature of Benjamin Fultz in the upper left hand corner.   Prior to this surprising and unexpected allegation, Mr. Fultz demonstrated he had no confusion over the amount contained in this paragraph:  he included this $85,000 dollar amount in the draft of the proposed final settlement document he prepared and sent on June 4.   (See Ex. 1, p. 2, Section 2, of draft contract).   This argument is frivolous.

### (b)  Lack of Arbitration Language

Defendants argue that the entry at p. 2 of the April 20 agreement (Dkt. 108-1, page ID#799) that states: "This is where arbitration language should be added" suggests lack of an agreement as to "what is to be arbitrated, by whom, or on what terms".  (Dkt. 112 at 9).  Here again, Defendants know that is not a correct statement.  The arbitration terms had been laboriously written out on page 6 of the same document as part of what the parties agreed would be embodied in the Agreed Entry.  The reference at page 2 to add arbitration language simply represents the agreement of the parties to insert the same language there rather than painstakingly write it all out again. This was well understood by Mr. Fultz as again illustrated by his first draft on June 4, where he transferred the handwritten language from the proposed Agreed Entry to his draft of the settlement agreement.  (Ex. 1, p. 6, Section 8.03).  Defendant also maintains that the fact an arbitrator wasn't named in the April 20 document in the language at page 6 means lack of agreement as to a material term.  But in fact the handwritten language contemplated just that - - that the parties might not agree upon on an arbitrator. The handwritten language thus provided as the alternative or default position the typical process by which each party picks one arbitrator,

---

[1] The redaction found at Dkt. 108-1 was done with white-out to provide a cleaner document.  The original form of the redaction can be found at Dkt. 104-1 where the $85,000.00 entry was simply blacked out.

and then those two pick the third.  The handwritten provision reads:  ". . . in the event the parties can't agree on an arbitrator, or the arbitrator cannot serve, each party shall select an arbitrator and these shall select a third". (Dkt. 108-1, page ID#803). This argument also is frivolous.

### (c) <u>Mistake</u>

The title of Section B of Defendants' Brief, at page 10, alleges there was a mutual mistake, but mistake as a defense to contract formation is not developed in that section of the Brief.  Contentions not developed by cogent argument and citations to the record and the law are typically waived**.** *Rahn v. Board of Trustees of Northern Illinois Univ*., 803 F,3d 285, 295 (7th Cir. 2015). In any event, there was no mutual mistake here.  As PDI explained in its opening brief, the Disputed Sentence was an important provision to PDI because it was deemed necessary to control or put an end to Defendants having misappropriated PDI's confidential information by teaching it to their employees in violation of their contractual promises not to do so.  (Ex. 2, White, at para. 8). PDI submitted documentary evidence from discovery that demonstrated this had been happening. (See Dkt. 108, at pp. 9-11; Dkt. 108-2 through 4). In the Response, Defendants never dispute this history.

That sentence had been in PDI's demand and draft settlement agreement from the start. (Ex. 2, White, at para. 7). The fact that it was contained in the final agreement signed on April 20 was no mistake to PDI.  What Defendants seem to argue is unilateral mistake.  The Fultz affidavit (Dkt. 112-2) states that prior to the settlement conference, it was not his intention to allow that sentence to remain in the Agreement, however that was prior to the negotiations taking place.  In the affidavit, Mr. Fultz does not deny signing the Agreement.  Instead, Defendants attribute the unilateral error to a document signed "late in the evening at the end of a very long day of intense negotiation at the settlement conference".  (Dkt. 112, p. 2).

Mutual mistake occurs where *both* parties share the same assumption about a vital fact upon which they based their bargain, and that assumption proves false. *Kesling v. Kesling*, 967 N.E. 2d 66, 78 (Ind. Ct. App. 2012); *Bowling v. Poole*, 756 N.E. 2d 983, 988-989 (Ind. Ct. App. 2001). That didn't happen here. On the other hand, a unilateral mistake about the content or provisions of what one signs is not a defense to formation of the contract unless the evidence shows the unilateral mistake was induced by the misrepresentations of the other party. *Mid-States General & Mechanical Contracting Corp. v. Town of Goodland,* 811 N.E. 2d 425, 435 (Ind. Ct. App. 2004). Defendants have not alleged that PDI misrepresented anything, nor could they reasonably do so—that sentence had been in the document since it was first provided to defense counsel several days before the Settlement Conference. A person is presumed to have read and understood what he signs. *Guideone Ins. Co. v. US Water Systems, Inc.*, 950 N.E. 2d 1236, 1247 (Ind. Ct. App. 2011). The contract at issue is not voidable for mutual mistake.

### (d) Lack of Mutual Assent; No Meeting of the Minds

Defendants argue, at p. 18 (Dkt. 112), that the term at issue, "instrumented soft tissue treatment", lacks a definition, and it needs a definition or it is ambiguous and thus there was no meeting of the minds. This is a curious position from Defendants who have practiced the approach for a number of years, hold themselves out as experts in it, actually taught it, and never suggested after receipt of the draft of proposed terms that Plaintiff required to settle the case, or at the Settlement Conference, that they didn't understand what the term meant. (See, Dkt. 108 at 19-22). The idea that the term was ambiguous arose four months after the Agreement was signed in April, and after Plaintiff had patiently responded to Defendants' CPM concern, and also patiently responded to a newly conceived concern about ethics. It is *the* form of therapy over which this litigation had been fought for the preceding two years. As the conduct of the

parties leading up to the Settlement Conference and at the Conference illustrated, it needed no definition.

The quotes at pages 18-19 of the Response from Dr. Sevier's blogs or Suzie Freeman's[2] deposition about forms of instrument assisted soft tissue mobilization other than ASTYM® miss the mark in this dispute. These comments clearly show that instrument assisted soft tissue mobilization is a generic term for attempted  "knock offs" of ASTYM® treatment.   It was the use of this approach that PDI sought to stop in Defendants' clinics, and this sentence was intended to be the means to accomplish that. (Ex. 2, White, at para. 8). Defendants have no one but themselves to blame for this dilemma—they created the problem by training their employees to utilize ASTYM® instruments and methods in their clinics in violation of their contractual promises not to transfer this knowledge to others, or train others in  instrument assisted soft tissue mobilization. Defendants polluted the well, and now want to suggest that  what they created  means what was agreed upon was ambiguous.  The language they signed was plain enough - - "At any facility providing therapy or health services [owned or controlled by Defendants], such Defendants shall recommend and encourage that all clinicians providing instrumented soft tissue treatment (i) be trained in ASTYM® Therapy . . . .  *No other instrumented soft tissue treatment shall be provided at any such facility.*" (Dkt. 108-1) (emphasis added). So it really doesn't matter if there are other forms of instrumented soft tissue treatment that one could confuse with ASTYM® treatment. They promised that at their clinics, *none* of these other approaches would be provided or utilized.  In an effort to manufacture an issue when none existed, defense counsel sought to re-negotiate this term four months after signing the Agreement.  The language counsel proposed is found at p. 20 of Defendants' Response.  It reads:

---

[2]  Ms. Freeman is a physical therapist and certified ASTYM® instructor.  She was one of the witnesses PDI sent to Virginia in November, 2012 to attend Defendants' seminar and see if they were breaching their agreements. She was the only witness deposed before the Settlement Conference.

No other proprietary or commercial soft tissue treatment shall be provided at any such facility. Notwithstanding the foregoing, PDI acknowledges and agrees that the individual therapists may use generic, non-proprietary or non-patented instruments that he or she deems appropriate, in his or her professional judgment, for the treatment of the patient, including but not limited to foam rollers, therapy balls, puddy, common cans (such as soup from a grocery store), roller balls, and knob handles.

Apart from the fact that Plaintiff had no obligation to re-negotiate a valid agreement, this language was a Trojan Horse. The problem wasn't the examples it provided - - foam rollers, cans, or roller balls. Nothing of that sort had ever been involved in ASTYM® treatment or the knock-offs of ASTYM® treatment at issue here, and PDI said this agreement wouldn't apply to these examples and it would provide a letter to that effect if that would clarify it for Defendants. The problem was those were just "including but not limited to" examples of a larger, less precise, mile-wide revision of the clear language they had already agreed upon, and which was important to PDI. Counsel's proposed language sought to modify the Agreement to allow "generic, non-proprietary, or non-patented instruments" to treat the patient. That modification would have rendered the operative sentence meaningless. That meant, for example, that any of the therapists at Defendants' clinics could obtain the knock-off instruments Andrew Bennett was talking about in his inappropriate "work around" e-mail to another clinic owner (Dkt. 108-2, page ID#805), or design their own, and do exactly what Plaintiff had sought to prevent them from doing by insisting upon the disputed language.

Ultimately, however, those contentions by Defendants about why wouldn't PDI re-negotiate the Agreement four months later are irrelevant. The meaning of the Disputed Sentence was well understood to Defendants. In the context of this case, it was not ambiguous.

9

### B.  Public Policy

### (1)  <u>Generally</u>

At pages 10-17 in the Defendants' Response they argue that the sentence, "No other instrumented soft tissue treatment shall be provided at any such facility," ought not to be enforced on public policy grounds.  Defendants then set forth two sources of public policy that they believe support their contention:

    i.    Certain parts of the American Physical Therapy Association Code of Ethics (the "APTA Code of Ethics"), and

    ii.    The corporate practice of medicine (the **"CPM"**) doctrine.

Defendants' public policy argument is addressed solely to the Disputed Sentence, and not the balance of the Agreement.  At pages 11-13, Defendants argue that an ethical code of a private organization - - the American Physical Therapy Association ("APTA") - - applies here and is a proper basis to declare the Disputed Sentence void.  Secondly, at pages 13-17, Defendants argue that the sentence would violate the CPM doctrine, as they understand it.  Both arguments are incorrect.  PDI addresses them separately in the order they appear.

At the outset, PDI deems it important to identify how the Indiana Supreme Court defines "public policy."  Indiana cases consistently hold that "public policy" is a limited concept.  Courts "look to the overall implications of constitutional and statutory enactments, practices of officials, and judicial decisions to formulate the public policy of this state." *Straub v. B.M.T. by Todd*, 645 N.E. 2d 597, 599 (Ind. 1994).  The same year, in *Hooks SuperX v. McLaughlin*, 642 N.E. 2d 514 (Ind. 1994) the Court stated the principle in similar fashion.  "What the public policy of a state is must be determined from a consideration of its Constitution, its statutes, the practice of its officers in the course of administration, and the decisions of its court of last resort."  *Id*. at 519, quoting *Hogston v. Bell*, 112 N.E. 2d 883, 886 (Ind. 1916).  The Court of Appeals follows this

formulation: "Any such public policy must be explicit, well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Wright v. City of Gary*, 963 N.E. 2d 637, 651 (Ind. Ct. App. 2012).

### **(2) APTA Code of Ethics**

At pages 12-13 in the Defendants' Response they argue that the Disputed Sentence is contrary to public policy because it would cause Defendants to behave contrary to certain parts of the APTA Code of Ethics. As explained *infra*, in substance the provisions of that code cited are not violated by the Disputed Sentence. But more fundamentally, there is no basis in Indiana law for the proposition that private entities may define this State's public policy. As the foregoing cases illustrate, public policy is defined by the acts of the government or acts that are promulgated with the force of law. An example is *Trotter v Nelson*, 689 N.E. 2d 1150 (Ind. 1997). In *Trotter*, the Indiana Supreme Court found that a lawyer's fee agreement violated public policy because it violated the Rules of Professional Conduct, which are enacted by the Indiana Supreme Court. The decision explains that the Rules "are explicit judicial declarations of Indiana public policy and, akin to contravening a statute, agreements in violations of these rules are unenforceable." 684 N.E. 2d at 1153. Properly understood, the argument that an ethical code may represent public policy is limited to those ethical codes promulgated by the government or its agencies, and which have the force of law. Private organizations like the APTA do not meet this test. The ethical code of the APTA does not define the public policy of Indiana.

Defendants maintain, at page 11 of the Response, that "For example, professional ethical codes can provide the basis for a public policy claim," and then string cite cases from other jurisdictions, omitting Indiana law. A closer look at those cases, however, reveals that the codes

at issue were ethical standards promulgated by government agencies, and thus are consistent with the law in this State as expressed in *Trotter*.  For example, *Rocky Mountain Hosp. & Med. Serv. V. Mariani*, 916 P. 2d 519  (Colo. 1996) applied the ethical code of the Colorado State Board of Accountancy.  *Rick v. Simoni*, 772 S.E. 2d 327 (W. Va. 2015) applied the Rules of Professional Conduct of the West Virginia Supreme Court.  *Hitesman v. Bridgeway*, 93 A. 3d 306 (N.J. 2014) declared, like Indiana, that "a clear mandate of public policy suggests an analog to a constitutional provision, statute, and rule or regulation *promulgated pursuant to law*."  *Id*., at 321 (emphasis in original), and the New Jersey Supreme Court went on to expressly *reject* the private ethical code of the American Nursing Association as a basis for a public policy claim. *Id*., at 322-323.  *Delaney v. Signature Health Care Found.*, 376 S.W. 3d 55 (Mo. Ct. App. 2012) did not relate to a private ethical code.  Instead, it found the public policy of Missouri favored organ donation by reference to "statutory provisions [that] reflect a clear mandate of public policy encouraging organ donation."  The dicta in cases about "professional ethics codes," read more carefully, means courts are referring to professions regulated by the government and for which the government or its agencies have promulgated standards of behavior or practice.  An ethical code of a private organization like the APTA does not qualify under this test, and is not a proper source to guide a court in making a determination of Indiana public policy.

Even assuming the ethical code of a private organization *could* properly be within the scope of an Indiana court's examination of public policy, the substance of Defendants' argument based upon the APTA Code of Ethics does not demonstrate that the Disputed Sentence in the Agreement violates that code.  Specifically, the provisions of the APTA Code of Ethics cited by the Defendants follow.  The Disputed Sentence would not (and should not) cause any physical therapists to deviate from these provisions.

12

      i.      Principle #3:  Physical therapists shall be accountable for making sound professional judgments.

      ii.      Principle #3A:  Physical therapists shall demonstrate independent and objective professional judgment in the patient's/client's best interest in all practice settings.

      iii.      Principle #3D:  Physical therapists shall not engage in conflicts of interest that interfere with professional judgment,

      iv.      Principle #7:  Physical therapists shall promote organizational behaviors and business practices that benefit patients/clients and society.

      v.      Principle #7A:  Physical therapists shall promote practice environments that support autonomous and accountable professional judgments.

Whether or not the Disputed Sentence is part of the Settlement Agreement (and thereby whether or not "other instrumented soft tissue treatment" is provided at Defendants' facilities), the physical therapists who work at the Defendants' facilities are perfectly free (and should be encouraged) to follow the provisions of the APTA Code of Ethics referred to in Defendants' Response.  If, within the judgment of a physical therapist who works at a Defendant facility, a particular patient would be best served by a service or procedure not offered at the facility, the therapist should so advise the patient of such, and help the patient receive the preferred care, by referral or otherwise.  This is true regardless of the preferred treatment, be it use of robotic devices, electrical stimulation, a particular instrumented soft tissue treatment, or anything else. Indeed, Principle #3C of the APTA Code of Ethics actually contemplates referrals for needed work that cannot be undertaken at a PT practice when it states, "Physical Therapists shall make judgments within their scope of practice and level of expertise and shall communicate with, collaborate with, or refer to peers or other health care professionals when necessary."  (Dkt. 112, Exhibit 3.)

### (3)  Corporate Practice of Medicine Doctrine

### (a)  CPM in General

The CPM concept began as a prohibition on corporations' employment of physicians.

The doctrine addressed the concern that the medical judgment of physicians might be

compromised if corporations or other legal entities were allowed to employ those physicians.

Nicole Huberfeld, Be Not Afraid of Change: Time to Eliminate the Corporate Practice of

Medicine Doctrine, 14 Health Matrix 243, at 253 (2004); see also Stuart Silverman et al.,

Corporate Practice of Medicine: A Fifty State Survey, preface, v (1st ed. 2014).

The development of the CPM doctrine is rooted in the American Medical Association's

("AMA") attempts in the latter half of the 19th Century to differentiate its physician members

from purported health care providers who lacked a traditional medical education.  Adam M.

Freiman, Comment, The Abandonment of the Antiquated Corporate Practice of Medicine

Doctrine: Injecting a Dose of Efficiency into the Modern Health Care Environment, 47 Emory

L.J. 697, at 699 (1998).  In the late 1800s, the AMA successfully lobbied state legislatures to

pass licensing statutes recognizing physicians as the individuals legally allowed to practice

medicine.  Huberfeld, supra, at 249.  These licensing statutes explicitly, or through interpretation

by state courts, prevented corporations (including hospitals) from employing physicians,

deeming such corporations to be practicing medicine in violation of the law.  Id.; see also Jeffrey

F. Chase-Lubitz, Note, The Corporate Practice of Medicine Doctrine: An Anachronism in the

Modern Health Care Industry, 40 Vand. L. Rev. 445, at 464-65 (1987).  These prohibitions and

limitations on the corporate practice of medicine varied from state to state, but at its core the

doctrine sought to protect a physician's medical judgment from unreasonable interference by that

physician's employer.  Huberfeld, supra, at 253.

### (b)  **CPM Today**

As of 2016, it is fair to say that the CPM doctrine has been considered, weighed, debated, and codified (or not codified) by state legislatures across the country.  (Ex. 5, Affidavit of R. Terry Heath (hereafter "Heath"), para. 8).  It also is fair to say that the application of the CPM doctrine is waning in the United States as health care providers of all types (hospitals, physicians, allied health care professionals, post-acute care facilities, etc.) integrate, consolidate, and standardize, all in the interest of providing better health care at lower costs.  *Id*.  (Indeed, this trend against application of the CPM doctrine was recognized by several practitioners as early as the mid-1980s,  see Chase-Lubitz, *supra*, at 470 n.185.)  Employment of physicians by non-physician owned entities, directly or indirectly, is extremely common across the country.  (Ex. 5, Heath, para.8).  In fact, in many jurisdictions a majority of certain physician specialties are so employed*. Id*.  As one author noted, "The corporate practice of medicine doctrine is a remnant of a time when doctors with black bags made house calls, and hospitals were a place where people went to be 'bled' and to die."  Huberfeld, supra, at 244.  Today, hospitals, physicians, and other providers extensively integrate their care in the best interests of patients.  (Ex. 5, Heath, para. 8).  One aspect of that integration is the routine employment of physicians and other providers by "corporations" across the country.  *Id*.

Defendants and their affiliates operate physical therapy practices (not physician practices) in Indiana, Colorado, Kentucky, and Texas.  The legislature in each of these four states has considered the CPM doctrine and promulgated laws consistent with what that legislature believes to be in the best interests of its citizens.  (Kentucky actually does not recognize the doctrine.) More detailed information about each of these states is set forth below.  However, as established by the laws of the four states at issue, the CPM in each state does not apply to the work

performed by Defendants' physical therapists.  Defendants only provide two examples of instances where the CPM doctrine has been extended to physical therapists: (1) an opinion letter issued by Iowa's Attorney General in 1974; and (2) a document prepared by the New York State Board of Physical Therapy in 1998.  (Dkt. 112, p. 14).  Neither of these jurisdictions are pertinent to the question before the court, and the limited citations support the fact that the CPM doctrine has been contracting since the mid-1980s.  (Ex. 5, Heath, para. 8).  For this Court to extend the CPM doctrine to physical therapists on public policy grounds would be a move contrary to the 30-year trend of contraction of this doctrine.  Further, as noted below, even if the CPM did apply, the limitation established by the Disputed Sentence would not violate that law.

### (c)  CPM – Indiana

Indiana's CPM law is somewhat hard to follow in some respects, but codifies the CPM concept discussed above.  In Indiana, the CPM concept has been codified for, and applies to, only two types of medical professionals, physicians and dentists.  The CPM law applicable to physicians (including those who hold valid unlimited licenses to practice medicine and osteopathic medicine in Indiana) is found in Article 22.5 of Title 25 of the Indiana Code.  The CPM law applicable to dentists is found in Article 14 of the Title 25 of the Indiana Code.

Indiana law dealing with physical therapists and the practice of physical therapy is found in Article 27 of Title 25 of the Indiana Code.  While this Article 27 limits the practice of physical therapy to licensed physical therapists (discussed in paragraph 14 below), it does not codify or apply the CPM doctrine to the practice of physical therapy.  Further, in Article 27, the Indiana Code plainly states that physical therapists are not authorized to practice medicine.  I.C. § 25-27-1-2(d)(2).  This clarifies that the CPM rules set forth in I.C. § 25-22.5 do not apply to physical therapists.

16

In the drafting of Articles 22.5, 14, and 27 of Title 25 of the Indiana Code, the Indiana legislature specifically chose to apply the concept of the CPM to physicians and dentists, but not to physical therapists.  In fact, nowhere in Indiana law is the CPM applied to physical therapy. This has been a common approach among many state legislatures.

Finally, in the Defendants' Response Brief the Defendants note that they believe Indiana's (and Texas') lack of application of the CPM law to physical therapists, "makes no sense" (Dkt. 112, p. 15).  While Defendants may disagree with the actions of the Indiana legislature (and the Texas legislature), such disagreement does not change the law.

### (d)  CPM – Colorado

Colorado's law dealing with the application of the CPM to physical therapy practices is set forth in C.R.S.A. § 12-41-124.  Colorado has a general prohibition against corporations (defined to include limited liability companies) practicing physical therapy unless the corporation is (i) formed pursuant to § 12-41-124(1), or (ii) one of a particular set of entities listed in § 12-41-124(5)(b).  The Colorado Defendant is not listed in § 12-41-124(5)(b). However, one must assume the Colorado Defendant is formed pursuant to § 12-41-124(1), otherwise it could not operate in Colorado.  Being so formed, the Colorado CPM rules do not apply to the Colorado Defendant.

### (e)  CPM – Kentucky

As noted in Plaintiff's Memorandum Brief in Support of Motion to Enforce Settlement Agreement (Dkt 108 at 23) Kentucky does not recognize the prohibition on the CPM. Defendants did not dispute this fact in their Response.

### (f)  CPM – Texas

As noted in Plaintiff's Memorandum Brief (Dkt. 108, pp. 24-25), the Texas CPM law does not apply to physical therapists.  Other than suggesting that "this makes no sense" (Dkt. 112, p. 15), Defendants do not dispute this fact in their response brief.

### (g)  CPM – Limitations on Services and Procedures in General

As noted above, the CPM doctrine does not apply to Defendants' physical therapists in the subject states.  Moreover, for this Court to extend the CPM doctrine to physical therapists on public policy grounds would be a move contrary to general trend of contraction of this doctrine.  However, even if this Court extended the CPM doctrine to physical therapists in this instance, the Disputed Sentence in the settlement among the parties would not violate the law.  The Defendants seem to make the argument that if an employer of a licensed professional makes the decision to not offer a service or procedure within the scope of the professional's expertise, the CPM is violated.  This simply is not true.  Nearly all health care facilities limit their services and procedures.  Hospitals routinely determine not to offer heart surgery, joint replacement, and other care.  These limitations do not violate the CPM laws even if its medical staff and/or employed physicians are capable of providing those services and/or performing those procedures.  By a facility not offering certain services and/or procedures, the facility is not controlling the medical professional's judgment.  The facility is merely controlling what can be undertaken at that facility.  The medical professionals are expected (and mandated) to render advice which is in the best interests of their patients, even if that advice requires the patient to seek care elsewhere.

### C.  Alleged Improper Practice of Physical Therapy

In addition to the above, Defendants make an argument based on state statutes that limit the practice of physical therapy ("PT") to licensed physical therapists.  This argument proposes

18

that the inability of a PT practice to offer certain physical therapy procedures or services constitutes the unlawful practice of physical therapy.  This is a considerable stretch in logic. Limitations on the scope of services offered at PT practices (which practically exist at all PT practices except those very few that might offer absolutely everything) do not constitute the unauthorized practice of physical therapy.  Otherwise a vast number of PT practices (presumably including some of Defendant's practices) would be routinely breaking the law.  Further, such limitations (e.g., the lack of a robotic devices, electrical stimulation, etc.) should in no way affect the professional judgment and advice of the licensed physical therapy professionals.

Statutes dealing with the unlawful practice of physical therapy prevent unlicensed individuals from practicing physical therapy.  They do not:

i.     require licensed physical therapists to engage in all types of physical therapy care;

ii.    require physical therapy practices to offer all types of physical therapy, or;

iii.   prevent a physical therapist who believes a particular procedure to be in the best interests of his/her patient from referring that patient to a location where that procedure is available when it is not available at his/her practice.

The leap from the fact that a particular PT practice does not offer all types of PT care to the conclusion that such fact constitutes the unlawful practice of physical therapy is neither logical nor practical.

## D.  Opinion Affidavits

R. Terry Heath ("Heath") and Myra Selby ("Selby") (Dkt 112-4) have both submitted affidavits rendering opinions on the Corporate Practice of Medicine ("CPM") Doctrine.  Both Selby and Heath agree that in Indiana the CPM Doctrine has not been extended to physical therapists (Selby Affidavit, para.7; Heath para. 9).  The Defendants are physical therapists. Selby does not opine on any other jurisdiction and CPM.  Heath was clear that in all other

relevant jurisdictions, as established by the laws of those four states at issue, the CPM Doctrine in each state does not apply to the work performed by Defendants' physical therapists (Ex. 5, Heath Affidavit, paras. 10,11,12).  According to these opinion affidavits,  it is undisputed that the CPM Doctrine does not interfere with the legality of the Disputed Sentence.

Selby's concern that the Disputed Sentence could have ethical ramifications does not take into account the practical solution of referring patients to another facility to obtain whatever care is deemed necessary in their professional judgment. This is a widespread practice, and solves any ethical concerns.  Selby does not address this widespread practice,  however Heath explains why this practice solves any ethical violations and is a common practice in healthcare (Ex. 5, Heath, para. 7).  Perhaps more importantly, as explained above, the ethical code of the APTA is not public policy in Indiana, nor any other relevant state.

Selby bases concerns on the premise that the Disputed Sentence would control the independent professional judgment of therapists employed by the Defendants (Selby Affidavit, para. 8).   It is unclear where this premise or understanding originated, but it is not correct.  Very few, if any, practices offer all services, and if services not offered at a certain facility are deemed to be best for a patient based on professional judgment, the common practice is to refer the patient to another facility.  This common practice solves any concern about unlawful practice, even though such a concern on its face has been noted as a "considerable stretch in logic" by Heath with further comment "The leap from the fact that a particular PT practice does not offer all types of PT care to the conclusion that such fact constitutes the unlawful practice of physical therapy is neither logical nor practical". (Ex. 5, Heath, para.14).  The concerns of the Defendants are not valid on their face, and even if there were any merit to a concern, it would be solved with the widespread common practice in healthcare of referring a patient to another facility.

Respectfully submitted this 14th  day of January, 2016.

<div style="margin-left: 40%;">

DEFUR VORAN LLP
BY/s/  Scott E. Shockley
Scott E. Shockley #2153-18
Matthew L. Kelsey #29313-49
400 South Walnut Street Suite 200
Muncie, IN 47305
Telephone: 765-288-3651
Facsimile: 765-288-7068
Email: sshockley@defur.com
Email: mkelsey@defur.com
ATTORNEYS FOR PLAINTIFF

</div>

<div style="text-align: center;">

CERTIFICATE OF SERVICE

</div>

I certify that on the 14th day of January, 2016, a copy of the above and foregoing document was electronically filed through the ECF System, which will send a notice of electronic filing to:

Bryce H. Bennett, Jr.
Nicholas C. Dugan
Riley Bennett & Egloff, LLP
Fourth Floor
141 East Washington Street
Indianapolis, IN 46204

Benjamin C. Fultz
John David Dyche
Kyle G. Bumgarner
Fultz Maddox Hovious & Dickens PLC
101 S. Fifth Street, 27th Floor
Louisville, KY 40202-3116

<div style="margin-left: 40%;">

/s/   Scott E. Shockley
Scott E. Shockley

</div>